**FILED**
U. S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

DEC 16 2020

JAMES W. McCORMACK, CLERK
By:_____
                    **DEP CLERK**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

MUR SHIPPING BV

                    Plaintiff,

        -against-

LALUMINA LLC

                    Defendant.

**Case No:** 4:20-cv-01461-BSM

**VERIFIED COMPLAINT**

Plaintiff MUR Shipping BV (hereinafter "MUR" or "Plaintiff"), as and for its Verified

Complaint against Defendant LAlumina LLC (hereinafter "LAlumina" or "Defendant"), alleges

upon information and belief as follows:

1.      This action involves a claim for breach of maritime contract of affreightment

("COA") that provided for ocean transportation of raw materials and thus falls under the Court's

admiralty and maritime jurisdiction pursuant to 28 U.S.C. §1333.  This action also constitutes a

maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and

qualifies as a maritime contract for purposes of jurisdiction and the issuance of a Rule B

attachment.

2.      Defendant cannot be found within this District within the meaning of Supplemental

Admiralty Rule B.

3.      Venue is properly situated in this District because Defendant's property is, or soon

will be, in the possession, custody, and control of Garnishees located within this District.

This case assigned to District Judge___Miller_____
and to Magistrate Judge_____Ray_____

4.      At all times material hereto, Plaintiff MUR was and still is a business entity duly organized and existing under the laws of a foreign nation with an office and place of business at Suite 226, Building 4, Gold & Diamond Park, Dubai, United Arab Emirates.

5.      At all times material hereto, Defendant LAlumina was and still is a corporate entity organized and existing under the laws of Delaware and with an office and principal place of business in Louisiana, but no office or presence within this District.

### Contract Terms

6.      Under a COA dated December 5, 2019, Plaintiff agreed to load and transport by sea twelve – fourteen (12-14) shipments of bauxite during 2020.  A copy of the COA is attached as Exhibit A and incorporated herein by reference.

7.      During the period January - May 2020, MUR duly nominated vessels, LAlumina duly shipped 5 cargoes of bauxite, and MUR carried those shipments on the vessels Searider, Sealuck, Sofie Victory, Orient Trader and Nautical Georgia.

8.      Thereafter, and despite an obligation to ship additional cargoes throughout the balance of 2020, LAlumina failed and/or declined, without justification, to provide any additional cargoes despite repeated demand from MUR.

9.      Specifically, no shipments were made nor nominations tendered for liftings in June, July or August, and as of September, there was no indication from LAlumina of any intention to ship any cargo for the balance of the year.

10.      By letter transmitted via brokers on August 21, 2020 and September 8, 2020, MUR noted LAlumina's default, and outlined the damages it had suffered/would suffer as a consequence of the failure to provide the cargoes for the June – December 2020 liftings.

2

11.     The losses for the months of June, July and August amounted to $654,306.28, with the balance of the losses (based upon the historical difference between the BSI average and the contemplated route BS19) over the remainder of the contract (i.e. September – December) was $838,997.68, for total damages of $1,493,306.96.  (See Ex. B, email traffic/letters to LAlumina dated August 21 and September 8, 2020, with accompanying damages calculation.)

12.     Defendant LAlumina has never challenged that its failure to provide the remaining cargoes was a breach under the COA, nor has it disputed the losses as calculated by MUR.

13.     The COA provides for the arbitration of disputes in London, and MUR reserves the right to adjudicate the merits of the dispute in London in the event the liability for the sums outlined above is disputed.

14.     In addition to recovery of the damages as aforesaid, MUR brings this action for purposes of obtaining security, in advance of a judgment, under Supplemental Admiralty Rule B, as Defendant LAlumina cannot be "found" within the District for purposes of an attachment under that Rule.

15.     In addition to the principal sums due, MUR seeks security in an amount which will cover the award of interest, as well as attorneys' fees also recoverable in LMAA arbitration specified in the COA.

16.     MUR calculates the interest component of its attachment application as $104,530 based on an interest rate of 3.5% over the period the claimed sums have been outstanding and as projected out for a further 1.2 years within which judgment is anticipated.

17.     Further, and to the extent claims in arbitration in London under the applicable LMAA Rules empower the arbitrators to award legal fees, MUR also seeks security in an amount

which will cover the anticipated legal fees incurred in connection with the presentation of this claim, estimated to be $100,000, with recoverable arbitral costs estimated at $25,000.

18.     In total, therefore, Plaintiff MUR estimates, as nearly as can be computed, that the total judgment will be $1,722,836.96, inclusive of the principal amount of the claim, interest, costs and attorneys' fees.

### Request for Rule B Relief

19.     Upon information and belief, and after investigation, Defendant cannot be "found" within this District for the purpose of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims, but Plaintiff is informed that Defendant has, or will have, assets within this District comprising, inter alia, cash, funds, escrow funds, credits, debts, accounts payable from, belonging to, due to it or for the benefit of it (collectively hereinafter "ASSETS"), including but not limited to such assets (including accounts payable) at Almatis, Inc. (See Declaration of Gordon S. Rather, Jr.)

20.     The total amount to be attached pursuant to the calculations set forth above is $1,722,836.96

WHEREFORE, Plaintiff MUR prays:

        a.   That process in due form of law according to the practice of this Court may issue against Defendant LAlumina citing it to appear and answer the foregoing, failing which judgment by default may be entered seeking recovery of the principal claim plus interest, costs and reasonable attorneys' fees as aforesaid;

        b.   That if Defendant cannot be found within this District pursuant to Supplemental Rule B, that all tangible or intangible property and ASSETS of Defendant LAlumina, up to and including the sum of $1,722,836.96, be restrained and

attached, including but not limited to any and all such ASSETS as may be in the possession, custody or control of Almatis Inc. (its largest customer) and/or any other garnishee(s) who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein;

c. That since it appears that the U.S. Marshal's Service is operating on a limited basis under the current Covid 19 crisis, service of Process of Maritime Attachment and Garnishment be made by any person over 18 years of age and who is not a party to this action pursuant to FED. R. CIV. P. 4(c); and

d. For such other, further and different relief, as the Court may deem just and proper in the premises.

Dated:  Little Rock, Arkansas
December 16, 2020

WRIGHT, LINDSEY & JENNINGS LLP
200 West Capitol Avenue, Suite 2300
Little Rock, Arkansas 72201-3699
(501) 371-0808
FAX: (501) 376-9442
E-MAIL:  grather@wlj.com


By: _____
        Gordon S. Rather, Jr. (68054)

*Attorneys for Plaintiff*

## ATTORNEY VERIFICATION

Pursuant to 28 U.S.C. § 1746, Gordon S. Rather, Jr. declares and states:

1.      I am a partner with the law firm of Wright, Lindsey & Jennings LLP, attorneys for Plaintiff in this action. I have read the foregoing Verified Complaint and know the contents thereof, and the same are true to the best of my knowledge, information and belief.

2.      The sources of my information and the grounds for my belief are communications, information and documentation provided by our client and/or by representatives/counsel of the client.

3.      The reason this verification is made by an attorney and not by the Plaintiff is because the Plaintiff is a foreign corporate entity, none of whose officers are presently within this Judicial District.

4.      I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Dated:  December 16, 2020


By: _____

Gordon S. Rather, Jr.

537340.1
2236498-v1

## Rule B Search Declaration

Gordon S. Rather, Jr. pursuant to the provisions of 28 U.S.C. § 1746, declares and states as follows:

1.      I am an attorney admitted to practice before this Court and am a partner with the firm of Wright, Lindsey & Jennings LLP, attorneys for Plaintiff, and I am familiar with the facts of this matter.

2.      To the best of my information and belief, the above-named Defendant cannot be "found" within this District within the meaning of Supplemental Rule B for Admiralty or Maritime Claims.

3.      In support of this assessment, I caused a search to be made by going to the Louisiana Secretary of State website (https://v,rww.sos.la.gov/Pages/dcfault.aspx) and searching the Commercial Division for the Defendant - LAlumina LLC.   This database contained a record of the Defendant, showing it to be a Delaware entity and upon information and belief, its principal place of business is Louisiana. (See Exhibit C at pp. 1-2.)

4.      Further, although the information currently displayed on the aforementioned website identifies a mailing address and principal business office in care of "Almatis Inc., 4701 Alcoa Road, Benton, AR 72015", upon information and belief, LAlumina was sold to Arthur Metals in or about June 2019, indicating that such information is a mere holdover from the previous owners. See Exhibit D.

5.      Due to, upon information and belief, LAlumina being incorporated in Delaware with a principal place of business in Louisiana, LAlumina cannot be subject to general personal jurisdiction within Arkansas.   Also, and very importantly, I caused a search to be made by going

7

to the Arkansas Secretary of State website and searching the Corporation and Business Entity Database for the Defendant - LAlumina. This database contained no record of the Defendant having authority to do business in Arkansas. (See Exhibit C at pp. 3-4.)

6.      I also searched additional, online directories for Arkansas in addition to running a generic search engine (Google.com) searches and found no listings of Defendant in this District.

7.      Therefore, I submit that any reference to LAlumina having a presence in this state must be erroneous.

8.      For the foregoing reasons, it is my informed belief that the Defendant cannot be served with process within the District and that the Defendant cannot be "found" within this District within the meaning of Supplemental Rule B.

9.      I therefore respectfully request, on behalf of the Plaintiff, that the Court issue an order directing the Clerk of the Court to issue Process of Maritime Attachment and Garnishment with respect to the Defendant's property within the District.

Dated:  December 16, 2020

By: _____
           Gordon S. Rather, Jr.

537340.1
2236498-v1

Exhibit A

| | |
|---|---|
| **From:** | Anne Askov [aav@murship.com] |
| **Sent:** | Friday, August 21, 2020 4:24 AM |
| **To:** | Tom Crampton |
| **Subject:** | FW: coa, Kamsar - Sherbro River - Trombetas - Burnside |
| **Attachments:** | LAlumina- loading regulations – applicable starting January 24, 2013 - Port of Kamsar.pdf; LAlumina- Trombetas Loading Terms.pdf; LAlumina - Impala Terminal Discharging Terms for bauxite imports.pdf; LAlumina - Ever Reliance 26-07-2019.pdf; Sierra Leone Bauxite Loading Conditions.pdf |

**From:** Danbroker Copenhagen <chartering@danbro.dk>
**Sent:** Thursday, 5 December 2019 07.26
**To:** Anne Askov <aav@murship.com>
**Subject:** coa, Kamsar - Sherbro River - Trombetas - Burnside

Anne / Heinrich

good morning,

further our last, pleased to confirm the following fixture dated 05-12-2019

- Negotiations and fixture to remain strictly private and confidential.

- Account LAlumina, LLC, Sorrento, Louisiana (USA)
  MUR accept Lalumina as their counterparty. However, they have certain corporate governance and vetting procedures to satisfy internally,
  meaning they will in due course ask for charterers' assistance to full fill these procedures satisfactorily.

- Tonnage to be nominated by MUR, Amsterdam, as Owners, disponent- or timechartered Owners

- nomination of performing vessel and any subsequent substitution to be subject to
  Shippers/Receivers approval within 1 Burnside working day after receipt of complete nomination,
  which to include full description, preferably (Baltic99), and the following documents:
  Rightship, H&m, CoFr, PandI, Class, ISPS, ISSC, Doc, ISMC, Cert of reg., International tonnage cert.
  Also Owners to advise last 5 ports of call and cargoes carried.

- Owners undertake that the beam of the performing vessel shall not exceed 32.26 metres!

  MAXIMUM 15 YEARS OLD DURING THE PERFORMANCE OF THIS CP.
  GEARED OR GEARLESS SINGLEDECK SELFTRIMMING BULKCARRIER.
  ENGINE/BRIDGE AFT.
  STEELFLOORED THROUGHOUT ALL HOLDS.
  VESSEL HAS NO FORE AND AFT HOLD DIVISIONS AND VESSEL IS NOT CLASSED
  AS WOODCHIP-CARRIER.
  VESSEL HAS NO CENTRELINE nor longitudinal BULKHEAD OR BEAM,
  horizontal corrugation, NO fixed stanchions (=only collapsible)

1

alongside the holds/hatches (fixed/permanent
stanchions in front of the crane houses only), posts or other elements
protruding into holds and/or way of hatch openings.
vessel to have CLEAR/UNOBSTRUCTED HOLDS WITHOUT ANY CONTAINER-FITTINGS
or other obstacles.
OWNERS WARRANT THAT VESSEL HAS NO TWIN-HATCHES.
OWNERS WARRANT THAT THE VESSEL HAS NO PONTOON-HATCHCOVERS.

CLASSED HIGHEST LLOYDS REGISTER +100a1 OR EQUIVALENT
BEING A MEMBER   OF THE I.A.C.S. AND TO BE SO MAINTAINED
THROUGHOUT THIS CP FULLY P+I INSURED WITH ÆÆOYDS UNDERWRITERS
OR OTHER FIRST CLASS P&I CLUB BEING A MEMBER OF THE INTERNATIONAL
GROUP OF P&I CLUBS AND TO BE SO MAINTAINED THROUGHOUT THIS CP
VESSEL TO BE I.S.M. COMPLIANT AND TO BE IN POSESSION OF A VALID
INTERNATIONAL SHIP SECURITY CERTIFICATE (ISSC) OR THEIR INTERIM
INTERNATIONAL SHIP SECURITY CERTIFICATE (IISSC), COPY OF WHICH TO
BE MAILED TO CHARTERERS AS WELL AS COPY OF VALID ISM CERTIFICATE,
COPY OF VALID IMCO CODE CERTIFICATE,
ALL TO BE SUBMITTED TO CHARTERERS FOR APPLICATION OF
SUBJECTS OF STEM/SHIPPERS/RECEIVERS APPROVAL.
OWNERS ALSO HAVE TO DULY FILL IN THE NECCESARY LOADPORT
QUESTIONNAIRES, WHICH ARE CONSTITUTING A PART OF A VALID NOMINATION.

VESSEL TO BE ACCEPTED BY RIGHTSHIP.

- THE VESSEL INCLUDING HER HOLDS, HATCHES AND ALL OTHER EQUIPMENT TO
  BE SUITABLE AND FITTED/EQUIPPED IN ALL RESPECTS FOR THE LOADING,
  CARRIAGE AND DISCHARGE OF BAUXITE IN BULK AND TO CONFORM WITH ALL
  APPLICABLE REGULATIONS OF GUINEA, BRAZIL AND USA INCLUDING THE LOADING
  FACILITIES AT PORT KAMSAR AND TROMBETAS.

- for

- contract of affreightment for 12 to 14 shipments in Charterers' option
  to be shipped in bottoms of 55,000 mt 10% moloo if loading Kamsar and 50,000 mt 10% moloo if loading
Trombetas
  and 55,000 mt 10pct moloo if Loading Sherbro River.

- cargo: Group C bauxite Cargo. "Bimco solid bulk cargoes that can liquefy clause for charter parties 2012" is
incorporated
  and applicable in entirety.
  If loading Trombetas, the cargo is described as 'bauxite in bulk' and if loading Kamsar cargo is described
  as 'low mono grade bauxite'.

- Shipments to be evenly spread between January 1 and December 31, 2020, however Charterers option to
declare up to 2 shipments in any two months,
  but it is understood and agreed that one cargo to be shipped from Sherbro River with laydays 5/9 January,
2020.

2

- for loading Trombetas, the Chrts to give Owners 30 days' notice of required layday commencement with
  stem in order for a 7 days spread and within 5 days Owners to nominate a named vessel or suitable
substitute
  to reach Charterers not later than 15 days prior 1st day of laycan. Owners to name actual performing vessel
  with expected intake, always within the agreed min/max quantity, latest 5 days prior to vessel's eta loadport.
  Performing vessels and any subsequent substitution to be subject to Shippers/Receivers approval within
  1 Burnside working day after receipt of complete nomination.

  for loading Kamsar, the notice by Charterers and nomination by the Owners to be in accordance with
  paragraph 9
  of the "loading regulations - applicable starting January 24, 2013 - Port of Kamsar" but replace 2 working
days by
  1 working day.
  B. Scheduling (8) this part must be between Charterers and shippers:
  C. Loading (9) vessel cannot be rejected if within all requirements as per contract

- "Loading Regulations – Applicable starting January 24, 2013 - Port of Kamsar" to apply if loading Kamsar and
  "Trombetas loading terms" to apply if loading Trombetas and for discharge "Impala Terminal Discharging
   terms for Bauxite imports", to apply, all of which as attached and to overrule and form part of the Charter
Party,
  and where applicable replace the word "seller" with "charterers" and the word "buyer" with "owners"

- loading: 1 safe berth Port Kamsar, Guinea
  or in Charterers' Option Trombetas, Brazil
  Charterers cannot declare Trombetas as loading port in the period from 1st October until 1st December,
  and should there be a shipment from Trombetas within that period affected by a draft reduction the
  charterers will pay 50% deadfreight!
  or in Charterers' option 1 safe anchorage Sherbro River, Sierra Leone
  before nominating a cargo from Sherbro River, charterers to check the situation around Ebola and advise
MUR what they have found
  and MUR to advise if findings are satisfactory.

- Sierra Leone Bauxite loading Conditions, as attached, to apply with the following corrections:
  clause 2)
  correct to 13 m brackish water
  add 'in case of any disputes to vessels cleanliness, independent surveyor to be called in whose decision to be
binding both parties'
  clause 4)
  Owners will nominate final performing vessel latest 5 days prior ETA.
  refusal of the vessel can only be made if vessel is not meeting the requirements.
  3rd para delete 'and/or (b) terminate the contract'.
  clause 6
  add "Boarding authority inspect vessel in Freetown at Delta 1 anchorage position and transshipment of cargo
is done at Buoy 4."
  clause 12)
  correct departure draft to 13 m brackish water density 1018/1020.

- discharge: 1 safe berth Impala Terminal, Burnside
  in case the Impala Terminal Berth will be affected by flood water,
  the charterers to endeavor to have the vessel discharged midstream to
  avoid vessel to be kept alongside by tugs or an alternate berth, not
  affected by such flood water.

  AT ALL PORTS OWNERS TO SATISFY THEMSELVES ABOUT ALL THE PREVAILING
  RESTRICTIONS INCLUDING DRAFTS WHICH ARE ENTIRELY AT OWNERS' RISK

- FREIGHT:
  usd 16.00 if loading Kamsar
  usd 21.15 if loading Trombetas,
  usd 16.75 if loading Sherbro River and January
  usd 17.50 if loading Sherbro River rest of 2020
  all per metric ton intaken weight, fio spout/chute/grab trimmed, whichever is applicable at the loadport
  except for Sherbro River, when Sierra Leone Bauxite loading Conditions, as attached, to apply, suitably
  corrected, as agreed.

  beneficiary in Owners' freight invoice, which must be issued on owners
  letterhead, must be the same as Owners inserted in the c/p. initial freight
  will be paid less commission.

- Kamsar loading terms
  20,000 mts per wwd of 24 consec hrs shinc, 12 hrs tt
  owise as per attached Kamsar loading regulations

  Trombetas loading terms
  28,000 mts per wwd of 24 consec hrs shinc, 12 hrs tt
  owise as per attached Trombetas loading terms

  Sherbro River Loading terms
  7,000 mts per wwday of 24 consec hrs shinc, self load
  otherwise as per attached Sierra Leone Bauxite loading conditions,
  suitably corrected as agreed.

  dischterms:
  13,000 mts per wwd of 24 consec hrs shinc, 12 hrs tt
  owise as per attached Impala discharge terms.

- TAXES AND/OR DUES AND/OR WHARFAGES ON VSL/FREIGHT TO BE FOR OWNERS' ACCOUNT.
  TAXES AND/OR DUES AND/OR WHARFAGES ON CARGO INCLUDING PUT/MMRT AND/OR INFRAMAR TO BE
  FOR SHIPPERS'/CHARTERER'S ACCOUNT.

- any war risk insurance, extra war risk insurance for vsl and crew incl full
  piracy/ransom insurance to be fully for owners' acct.

-voywar clause to be replaced with newest version 2014

-Demurrage.
Together with final nomination, Owners to declare demurrage up to usd 15,500 pdpr / hd wts be
It is understood and agreed that if the vessel should enter into demurrage at Burnside,
the vessel for such period to be free from dockage charges, or the daily dockage charge,
free of commission, to be added to the rate of demurrage.

- owise terms/conditions as per "Ever Reliance or sub c/p 26-07-2019", as attached,
  logically amended and adjusted in accordance with main terms agreed, but in lines
  98 and 100 delete "zach.mayer@argintl.com"  and instead add "gabriel.henn@lalumina.com,
Aaron.Templet@lalumina.com
  and jamie.sanner@lalumina.com"
  and the following alterations:
  Clause 28 – L133 delete 'an umpire' and insert '3rd arbitrator'
  Clause 28 – L133/L134 delete 'and claimants…. and absolutely barred'.
  Clause 43, add 'in case of any disputes independent surveyor to be called in whose decision to be binding
both parties, and party at fault to carry costs and time'
  Clause44 – add at the end 'subject to voywar 2014.
  Clause 46, add 'if tugs/pilots required same to be for Charterers time and expense'
  Clause 58, Delete

For the record:

**BIMCO Solid Bulk Cargoes that Can Liquefy for Charter Parties**

(a)     The Charterers shall ensure that all solid bulk cargoes to be carried under this Charter Party are
presented for carriage and loaded always in compliance with applicable international regulations,
including the International Maritime Solid Bulk Cargoes (IMSBC) Code 2009 (as may be amended from
time to time and including any recommendations approved and agreed by the IMO).

(b)     If the cargo is a solid bulk cargo that may liquefy, the Charterers shall prior to the commencement of
loading provide the Vessel's Master, or the Master's representative, with all information and
documentation in accordance with the IMSBC Code, including but not limited to a certificate of the
Transportable Moisture Limit (TML), and a certificate or declaration of the moisture content, both signed
by the shipper.

(c)     The Owners shall have the right to take samples of cargo prior to loading and, at Charterers' request,
samples to be taken jointly, testing of such cargo samples shall be conducted jointly between Charterers
and Owners by an independent laboratory that is to be nominated by Owners. Sampling and testing shall
be at the Charterers' risk, cost, expense and time. The Master or Owners' representative shall at all
times be permitted unrestricted and unimpeded access to cargo for sampling and testing purposes.

If the Master, in his or her sole discretion using reasonable judgement, considers there is a risk arising
out of or in connection with the cargo (including but not limited to the risk of liquefaction) which could
jeopardise the safety of the crew, the Vessel or the cargo on the voyage, he shall have the right to refuse
to accept the cargo or, if already loaded, refuse to sail from the Loading Port or place. The Master shall
have the right to require the Charterers to make safe the cargo prior to loading or, if already loaded, to
offload the cargo and replace it with a cargo acceptable to the Master, all at the Charterers' risk, cost,
expense and time. The exercise by the Master of the aforesaid rights shall not be a breach of this Charter
Party.

(d)     Notwithstanding anything else contained in this Charter Party, all loss, damage, delay, expenses, costs and liabilities whatsoever arising out of or related to complying with, or resulting from failure to comply with, such regulations or with Charterers' obligations hereunder shall be for the Charterers' account. The Charterers shall indemnify the Owners against any and all claims whatsoever against the Owners arising out of the Owners complying with the Charterers' instructions to load the agreed cargo.

(e)     This Clause shall be without prejudice to the Charterers' obligations under this Charter Party to provide a safe cargo. In relation to loading, anything done or not done by the Master or the Owners in compliance with this Clause shall not amount to a waiver of any rights of the Owners.

end recap

Trust in accordance with your notes, but if not, please advise immediately!

Thanks your valuable support, which we appreciate very much!

Best regards

Heinrich Hamann
Dan-Broker (cvr 89927013)
Island Shipping & Trading ApS
Copenhagen/Denmark
(As agents only)
Off     : +45 45821017
Mob   : +45 40381519
Aoh    : +45 45814424

## LOADING REGULATIONS – Applicable starting January 24, 2013

## PORT OF KAMSAR

NOTE: The Loading Regulations may be revised from time to time.

### A. GENERAL PROVISIONS

1.  As used herein, **"CBG"** shall mean *Compagnie des Bauxites de Guinée*, **"Buyer"** shall mean the purchaser of CBG bauxite and **"Seller"** shall mean the seller of CBG bauxite.

2.  Deliveries shall be made, loaded and trimmed by CBG's telescopic chute to the Vessel Master's satisfaction free on board bulk carriers provided by the Buyer, which ships shall be suitable to berth and load at CBG's loading facilities at Port Kamsar, Guinea, and shall have characteristics suitable for loading and trimming of bulk cargoes, and shall be classed 100A1 with Lloyds Register of Shipping or equivalent class established by another recognized classification society. All ships are to provide an ISPS certificate and an IMO number on arrival at Kamsar prior to loading.

3.  The term **"bulk carrier"** shall mean a single deck vessel into which cargo can be loaded by CBG's loading facility without the necessity of hand trimming.

4.  The draft at the berth and depth of water in the channel approaches and swinging basin shall be determined by the port works as constructed by the responsible authorities of the government of Guinea.

5.  Vessels may be rejected for loading if the vertical distance from the waterline to the top of the highest hatch coaming exceeds 50 feet at any time while alongside the loading berth.

6.  The vessel quantity shall not be less than 43,000 metric tons.

**B. SCHEDULING**

7.    The vessel loading dates shall be deemed to allow for a total of twelve (12) laydays, five (5) of which shall precede the specified loading date and six (6) of which shall follow the specified loading date.

8.    CBG shall have the right, by twenty-five (25) days notice in the case where inventories are below 250,000mt, to defer any vessel loading date or estimated vessel loading date where appropriate to alleviate congestion at the port; provided, CBG shall have no right to defer the loading date of any vessel nominated within twenty-five (25) days of its loading date in accordance with these Loading Regulations.   Deferrals shall be in increments of five (5) days.  If a vessel loading date or estimated loading date would, as a result of a deferral hereunder, be deferred past 10 January of the following contract year, such loading date shall be considered canceled, in which event the Seller will inform Buyer and discuss alternative shipping.

**C. LOADING**

9.    At least thirty-five (35) days in advance of the beginning of the first of the twelve (12) laydays established pursuant to these Loading Regulations, Buyer shall give notice to Seller by email, telex or facsimile declaring seven (7) final laydays within the spread of twelve (12) laydays previously designated. In the event Buyer shall fail to give such notice as above provided, Seller shall, within five (5) days following the date on which such notice should have been given pursuant to this Clause, give notice to Buyer by email, telex or facsimile fixing seven (7) final laydays within the spread of twelve (12) laydays previously designated.

As soon as practical, as a general rule no later than ten (10) days prior to the estimated arrival of the vessel at Port Kamsar and in no event later than seven (7) days prior to the estimated arrival of the vessel at Port Kamsar, Buyer shall give Seller notice by e-mail,

2

telex or facsimile setting forth the name of such vessel, its flag, deadweight tonnage, radio call letters, Master's name and nationality, length overall, maximum beam, estimated cargo quantity and quality, estimated time of arrival at Kamsar, ISPS certificate number and IMO number, port of destination and the entity responsible for the payment of port charges on its behalf. Within two (2) business days in Guinea after receipt of the said notification, Seller by notice to Buyer by email, telex or facsimile–shall accept or reject the ship nominated.

Seller shall state in any notice of rejection the reason for rejection. If a ship is rejected, Buyer shall promptly arrange for another ship in its place and the procedure hereinbefore set out shall apply in respect of that ship and any subsequent ship nominated.

Buyer shall ensure that the Master of the ship notifies Port Kamsar by email, radio, facsimile or telex of the expected date and time of arrival of the ship at the pilot station at the port of loading at noon, ship's time, every other day commencing with the seventh day before it is expected that the ship will reach that point. Buyer shall or shall cause the Master to furnish Port Kamsar with such additional information and give such additional notices as shall be reasonably required by Port Kamsar. Port Kamsar shall acknowledge receipt of the initial ETA advice and shall provide information regarding berthing prospects.

No substitution of ships is permitted without the consent of the Seller.

10.   Each vessel shall be loaded at the standard rate of 24,000 metric tons for standard metal grade (SMG) bauxite and at the rate of 20,000 metric tons for low mono grade (LMG) bauxite per weather working day of 24 consecutive hours, Saturdays, Sundays and holidays included if lawful to work on such days.

Port Kamsar may, by written notice given to the vessel's Master no less than four hours in advance, require the vessel to leave berth prior to the loading of the quantity requested by Buyer as above provided. In this case, Seller shall indemnify Buyer against any

reasonable claim by the owner of the vessel for deadfreight resulting from such short loading. No vessel shall be required to leave berth prior to the loading of the quantity requested, less 5,000 metric tons.

Deadfreight shall be based on the quantity requested by Buyer, which shall not be greater per vessel than the lesser of (i) 61,500 metric tons or (ii) 110% of the nominated quantity or (iii) full permissible capacity of the vessel. "Full permissible capacity" shall mean the maximum tonnage which the vessel is able to carry in order (i) to leave the Port of Kamsar and (ii) to enter the discharge port, always safely afloat and in a seaworthy condition.

Except as provided in the second paragraph of this Clause 10, CBG's obligation to indemnify a Buyer for a claim for deadfreight resulting from short loading shall be limited to differences between requested quantity and bill of lading quantity which exceed 500 metric tons or 1.5% of the quantity requested, if greater.

Deadfreight capping per vessel at 60,000 metric tons is applicablewhen three or more vessels are anchored.
The above deadfreight capping shall not apply in respect of any vessel of more than 80,000 metric tons summer deadweight with vessel intake equal to or more than 75,000 metric tons.

11. When the vessel is in all respects ready to load, Notice of Readiness to load shall be given to Port Kamsar (by radio if desired) in and out of office hours, Saturdays, Sundays and holidays included if lawful to work on such days, vessel in berth or not.

If berth is available, vessel shall proceed immediately to the berth.

If berth is not available, vessels shall anchor as directed by the Harbor Master. Notice of Readiness may be given only upon completion of these movements.

4

Laytime shall commence 12 hours after the vessel tenders Notice of Readiness, if such notice is given within the period of seven (7) final laydays, whether or not the vessel is in berth, unless loading commences sooner, in which case laytime shall commence when loading begins.

If any vessel tenders Notice of Readiness for loading before the commencement of the seven (7) final laydays declared under these Loading Regulations CBG may load the vessel prior to the commencement of such laydays, and laytime shall commence when loading actually begins, but in no event later than noon local time on the first of the seven (7) final laydays.

If any vessel tenders Notice of Readiness to load after the expiration of the seven (7) final laydays declared pursuant to these Loading Regulations, laytime shall commence when loading actually begins, except as hereinafter provided.  If loading has not commenced within 96 hours after tendering of Notice of Readiness, laytime shall commence, unless loading shall actually begin sooner, 12 hours after the expiration of such 96-hour period, provided (a) CBG has been advised in writing as soon as possible and in any event prior to the expiration of the seven (7) final laydays fixed pursuant to these Loading Regulations, that the vessel will or may be delayed and the magnitude of such delay or possible delay and the reasons therefor and (b) the vessel actually arrives at Port Kamsar and gives Notice of Readiness within thirty (30) days after the beginning of the original twelve (12) laydays established.  Such vessel shall be considered as having arrived and given Notice of Readiness upon expiration of such period of 96 hours, and shall be treated thereafter as having given Notice of Readiness within its seven (7) final laydays.

Vessels will normally be loaded on a turn-in-berth basis, with priority to vessels giving Notice of Readiness within their seven (7) final laydays.

In the event, following the giving of Notice of Readiness, a vessel becomes incapacitated so as to be unable to proceed to berth, load and depart under its own power, laytime, or the 12 hour period preceding the commencement of laytime, as the case may be, shall be

suspended as of the time of occurrence of the incapacity. Time shall recommence at such time as the vessel has been repaired and is, to the satisfaction of the Harbor Master, in all respects ready to load. If the vessel becomes incapacitated while at berth, the Harbor Master may require the vessel to be towed to an anchorage away from the berth at the vessel owner's expense.

Vessels loading at Kamsar must be able to deballast at a rate to support full loading over a 20-hour period. If this is not the case, upon prompt notice to Buyer, Port Kamsar can give notice to the vessel to sail at the second high tide (if vessel is seaworthy) and not be responsible for the deadfreight.

As per clause 10 paragraph 1 the loading rate is per weather working day of 24 consecutive hours. Any time lost because of rain, time shall not count as laytime for vessel loading and for any vessel waiting to load and within its laydays unless already on demurrage.

Time used in shifting from a designated anchorage to the berth or from a designated anchorage to another designated anchorage shall not count as laytime or time on demurrage.

Any time lost for opening hatches of holds to be loaded shall not count as laytime or time on demurrage.

Any time lost loading due to the vessel's inability to be loaded at the agreed rates or due to any other defect and/or default of the vessel, deficiency and/or default of vessel's personnel (including inability of the vessel to de-ballast at a rate commensurate with the loading rate) shall not count as laytime or time on demurrage.

The Statement of Facts and Port Log (documented and signed by CBG and the Vessel master) to include:

6

a) All shifting times indicating date and time of anchor aweigh and date and time of anchoring or all fast alongside wharf.

b) Any lost time to indicate date and time of when loading stopped, reason for such stoppage, date and time when problem rectified, and date and time of resumption of loading if different from time problem was rectified

12. Demurrage, if any, shall be paid by Seller to Buyer for all time used in excess of the laytime allowed, fractions pro rata, at a rate calculated in accordance with the following formula:

$$D = \frac{R}{64,000}$$

Where:

D      is the demurrage rate applicable in respect of a three (3)-month period, in cents (U.S.) per summer deadweight metric ton per day of 24 hours

R      is the Estimated Representative Time Charter Rate (approximately 12 months) for Panamax Bulk Carriers, 64-65,000 dwt. (Rates shall be adjusted quarterly using a three month average as set forth in the following periods, (December-February) effective price date April 1, (March-May) effective price date July 1, (June-August) effective price date October 1, and (September-November) effective price date January 1, as published in <u>Drewry's Shipping Statistics and Economics</u>.)

Upon written request of the Buyer, Seller shall furnish Seller the demurrage rate applicable at such time. . In the event the basis of the index "R" in the formulas set forth above is altered or if such index is no longer published, then Seller shall inform Buyer which index shall apply.

Despatch, if any, shall be paid by Buyer to Seller for all laytime saved, fractions of a day pro rata, at three-quarters the rate of demurrage, calculated in accordance with the foregoing formulas.

No demurrage shall be paid if delay is caused by events of force majeure at Port Kamsar and/or force majeure declared by CBG under its long term bauxite supply agreements (each a case of "**Force Majeure**").

In such cases of Force Majeure:

   a.  If a vessel is on demurrage and has commenced loading, CBG and Buyer shall use their best efforts to complete the loading, and on completion thereof demurrage will cease.

   b.  Seller and Buyer shall use their best efforts to arrange for a prompt official clearance for the vessel, and on obtaining the same; the vessel shall proceed promptly to sea.

   c.  If a vessel is on demurrage and has not commenced loading, the vessel has the right to leave immediately if delivery of bauxite is excused by reason of an event of Force Majeure, or any time thereafter. Seller and Buyer shall use their best efforts to arrange for a prompt official clearance for the vessel, and on obtaining the same the vessel shall proceed promptly to sea.

   d.  If the vessel does not leave, demurrage will be limited to ten days following commencement of the period during which delivery of bauxite is excused by the terms of such Force Majeure.

   e.  If schedules are so disrupted, Buyer and Seller shall immediately consult with each other and arrange new shipping schedules.

8

13.   Buyer shall remove and replace all hatch covers and beams as required by CBG, Seller or Port Kamsar and shall assist in shifting the vessel when alongside the loading berth, should this become necessary.  If failure on the part of the vessel promptly to perform these functions when requested results in lost loading time, such time shall not count as laytime.  If shifting of vessel alongside the loading berth is requested, the vessel shall permit, for this purpose, the use of its winches and other appropriate gear and provide sufficient power for same at no cost to CBG, Seller or Port Kamsar.

**\*\*\*\*\*\*\*\*\*\***

 **Alcoa**

## ANNEX B
## LOADING CONDITIONS AT PORTO TROMBETAS, BRAZIL

**Porto Trombetas Terminal General Information:**

- Port: Porto Trombetas
- Geographic Location: Latitude 01º 27' 36" S, Longitude 56º 22' 47"W

### 1. Vessel Nomination
At least fifteen (15) days prior to the first day of agreed fourteen (14) laydays, Buyer shall nominate the performing vessel or sub, giving its full characteristics.

Vessel must conform to the following specifications and loadport limitations:
- Maximum permissible length of vessel: 240 m
- Maximum permissible beam of vessel: 40 m
- Maximum permissible draft is 11,58 m (38') - may be reduced during the dry season (October to December)
- Air draft permissible is minimum of 14m and maximum of 21 m, depending on river level
- Minimum hatch opening: 11.6 m x 12.60 m
- Maximum age: 18 years (older vessels can be analyzed during nomination)
- Maximum DWT: 100,000

All vessels nominated by Buyer shall be bulk carrier type, having bridge and engine aft, without tween decks and without centre line bulkheads, and shall be suitable to berth and load at the loading facilities on Seller's Port and shall be classed 100A1 with Lloyds Register of Shipping or equivalent class established by another recognized classification society.

Seller guarantees that the loading facilities and berth from which bauxite shall be shipped under this Agreement are safe berths and will accommodate vessels, always afloat, with the specifications acceptable to Sellers Port.

### 2. Arrival Notices
Master of vessel is to advise of the expected date and hour of arrival of his vessel at the pilot station at the port of loading 72, 48, 24 and 12 hours prior to vessel's expected time of arrival.
Vessel shall be accepted at the loading facilities at Loadport provided she is in all respects ready to load with all holds clean.

### 3. Notice of Readiness
When the vessel is in all aspects ready to load, Notice of Readiness to load shall be given to Seller at Port Trombetas in and out of office hours, Saturdays, Sundays and holidays included if lawful to work on such days, whether in berth or not, whether in port or not.

### 4. Laytime
Laytime shall commence three (3) hours after Notice of Readiness acceptance, unless loading sooner commenced.

Navigation/shifting time does not count as laytime used.



 **Alcoa**

Notice of Readiness is accepted, first of all, at the berth in Trombetas; if the berth is already occupied, the Notice of Readiness is accepted at the mooring buoy (there are 3); if the mooring buoys are occupied, the Notice of Readiness is accepted at the Trombetas mouth or, by extension, in any point of the Amazonas river including Fazendinha.

Laytime ends at the completion of loading.

In case of congestions at Trombetas Port, the 2nd, 3rd, 4th ships in the line is allowed to stay part of the waiting time in Fazendinha, under the procedure described below:

1. If the vessel arrives in Fazendinha 40 or more hours before the beginning of the laydays period, Notice of Readiness will be accepted at the beginning of the laydays period or at the Free Pratique granted, the later to happen.
2. If the vessel arrives in Fazendinha 40 or less hours before the end of the laydays period, Notice of Readiness will be accepted only in Trombetas at the start of loading operations. The same rule is applied for those ships arriving after the laydays period.
3. If none of the above situations happen, the vessel designated to wait in Fazendinha will be accepted there at the Free Pratique Granted.

**5. Preparation of Vessel**
Buyer at its sole risk and expense shall prepare the respective vessels for receiving and loading cargo prior to arriving at Seller's loading berth. Seller shall not be liable for any contamination due to unclean vessels. All shifting of the vessel to the loading berth, in the loading berth and from the loading berth shall be performed by Buyer expeditiously and at the sole risk and expense of Buyer. The vessel shall permit the use of ship's winches and other appropriate ship's gear actually on board and shall provide sufficient power for same without cost to Seller during the loading period.

**6. Loading Conditions / Loading Rate**
Each vessel shall be loaded at the standard rate of 28,000 metric tons per weather working day of 24 consecutive hours, Saturdays, Sundays and holidays included.

**7. Demurrage / Dispatch**
Demurrage and Dispatch shall be charged or earned at a rate of US$0.15 (fifteen cents of dollar) per metric ton per day/half dispatch.

**8. General Instructions**
Trombetas Terminal is an environmental area reserve. Therefore, no salt-water un-ballast will be allowed at this area. Buyer shall advise master or ship-owners that water ballast cannot have a salinity higher than 0.5% nor a water density greater than 996 kg/L to 1.000 kg/L.

Unless otherwise instructed by the Seller, the Buyer shall instruct master or ship-owners that Vessels must be presented for berthing with minimum ballast compatible with its respective seaworthiness and air draft restrictions, in order to avoid stoppages during loading operation.

It is forbidden any type of oil transfer, disposal or any operation that can cause risk of contamination.



Impala hereby grants User and such of its agents, representatives and invitees (collectively, "Agents") and each of its and their employees, all as designated in writing to Impala from time to time the right and privilege to access the Terminal. User shall be absolutely responsible and liable for its Agents and their actions, and for their compliance and/or non-compliance with this Agreement. Such access shall be conditioned on the following requirements:

**1.5.1   Compliance with Rules, Laws and Regulations.** User, its Agents and each of its and their respective employees shall access the Terminal in a manner as to cause minimum interference with Impala's operations. User agrees to and to cause its Agents to (i) comply with all rules posted by Impala at the Terminal, (ii) comply with all federal, state and local laws, statutes, ordinances, rules, and regulations that may be applicable to User's and its Agents' activities at the Terminal, and (iii) obtain all permits and licenses required by law.

**1.5.2   Controlled Substance Abuse.** User shall have adopted policies and procedures to ensure a drug and alcohol free work place, and enforce its policy with appropriate drug and alcohol testing programs. All testing programs shall specify substances, testing frequency and threshold levels, which, at a minimum comply with the Department of Transportation drug testing regulations.

**1.5.3   Safety of Vehicles and Equipment.** User agrees that all vehicles and equipment owned, leased or otherwise under the control of User and its Agents will be properly maintained, and in a safe condition. User shall remove any equipment that in Impala's discretion poses a safety hazard at the Terminal. In the event User fails to remove such unsafe equipment, Impala has the right to remove such equipment with User paying or reimbursing Impala for the cost of such removal.

**1.5.4   Incident Reporting.** User must report all incidents (including accidents and near misses) that occur at the Terminal in writing to Impala within 24 hours following such incident. The report should describe the incident and include any investigative materials or documents that User completes, and any related documentation and reports submitted to any entity, including but not limited to, any governmental agency, User's insurer, or others.

**1.5.5   No Agency Relationship.** Neither User nor its Agents act under the direction, control or supervision of Impala and none of the foregoing is an agent of Impala.

## SECTION 2. TERMINAL SPECIFICATIONS

**2.1.   Terminal Location**

The Terminal is located at Darrow, Louisiana, on the West Descending Bank of the Mississippi River. The Buoys are located at mile marker LMR 169.2. The Berth is located at mile marker LMR 169.5.

**2.2.   Midstream Operations**

Description of Buoys

5 buoys with a capacity of 150 metric tons each
The upstream buoy is located at a distance of approximately 1,235 feet from the downstream buoy.

Limitations

Maximum Length Overall: 230 meters / 755 feet

{N2933155 7}

Maximum Beam: 32.2 meters / 105.6 feet
Maximum Displacement: 85,600 metric tons
Maximum Air draft: 17 meters / 56 feet

Loading Rate

Loading Rate (per Weather Working Day) shall be per the terms of the Customer Contract

### 2.3.   Terminal Operations

Berth Description

Length of Berth: 335 meters / 1,100 contiguous feet
Length of Dock: 267 meters / 875 feet
Water Depth at Dock: 14 meters / 46 feet low water draft
Spout Reach from face of Dock: 40 meters / 131 feet

Ocean Vessel Limitations

Maximum Length Overall: 270 meters / 886 feet
Maximum Beam: 43 meters / 141 feet
Maximum Displacement: 169,500 metric tons (when fully loaded)
Maximum Air draft: 18.6 meters / 61 feet

Barge Unloading Limitations/Requirements

Maximum Width: 10.7 meters / 35 feet
Maximum Length: 62.5 meters / 205 feet

Loading Rate

Loading Rate (per Weather Working Day) shall be per the terms of the Customer Contract

### 2.4   Accuracy of Terminal Specifications

All descriptions and dimensions provided within this Section 2 are approximate, and Impala *makes no warranty or guarantee of the accuracy of this information*; provided, however, Impala guarantees the loading rates in Section 2.2 and Section 2.3 subject to the other terms hereof and any separate agreement between Vessel Party and Impala. The loading-rate guarantees in Section 2.2 and Section 2.3 will be adjusted if the Ocean Vessel has ship gear or other features that impede the normal loading capabilities of Impala. Guaranteed loading rates do not apply on Holidays.

### SECTION 3. VESSEL NOMINATIONS

### 3.1.   Nominations

3.1.1   **Ocean Vessel Nominations.**   Ocean Vessel nominations shall be furnished to Impala by confirmed receipt e-mail to **BurnsideShips@ImpalaTerminals.com** not earlier than 30 days and not later than 15 days prior to the Ocean Vessel's projected ETA at the Terminal. Such nomination shall include the Ocean Vessel IMO number, tonnage, loading drafts, name of carrier, and type of Cargo carried or to be carried and

{N2933155 7}

JW DRAFT 3/23/2015
*Burnside Terminal Rules and Regulations*
*Effective:* _____, 2015

shall include the additional information below based on type of Vessel. Acceptance by Impala of a nomination of a Vessel or scheduling of Barges shall be evidenced by Impala's confirmation by e-mail transmittal to the relevant Vessel Party, and Impala must respond to such nomination with 24 hours.

**Ocean Vessel (> 60,000 metric tons):**

    a.   Vessel Party shall request from Impala, in writing, a 10-day Layday Period at least 30 days prior to the date of the first day of the Layday Period. Impala shall advise Vessel Party in writing within 24 hours whether or not the proposed Layday Period is acceptable. If the proposed Layday Period is not acceptable, Impala shall offer Vessel Party an alternative Layday Period for Vessel Party's consideration.

    b.   No later than 15 days from the date of the first day of the agreed-upon Layday Period, Vessel Party shall identify in writing to Impala a 5-day Laycan within such original Layday Period. In each case mentioned above, the written approval of Impala shall be required relative to the 10-day Layday Period and the 5-day Laycan.

**Ocean Vessel (< 60,000 metric tons):**

    a.   Vessel Party shall request from Impala, in writing, a 7-day Layday Period at least 30 days prior to the date of the first day of the Layday Period. Impala shall advise Vessel Party in writing within 24 hours whether or not the proposed Layday Period is acceptable. If the proposed Layday Period is not acceptable, Impala shall offer Vessel Party an alternative Layday Period for Vessel Party's consideration.

    b.   No later than 15 days from the date of the first day of the agreed-upon Layday Period, Vessel Party shall identify in writing to Impala a 4-day Laycan within such original Layday Period. In each case mentioned above, the written approval of Impala shall be required relative to the 7-day Layday Period and the 4-day Laycan.

      **3.1.2    Barge Requirements.** The Vessel Party shall provide the following information on each Barge not later than 7 days prior to the projected ETA of the Barge at the Terminal: the individual barge number, tonnage, loading drafts, name of carrier, projected ETA, a designation of whether the Cargo is to be delivered to the storage pad or held for direct transfer to Ocean Vessel, and the type of Cargo carried or to be carried, which report shall be subsequently updated on the Monday of each week until such Barges are received at the relevant fleet. All Users and their Barges utilizing the facilities and services of Impala shall be subject to and shall abide by the terms and conditions of these Rules.

**3.2.    Filing**

      All Ocean Vessels and Vessel Parties which intend to utilize the facilities and services of Impala shall file with Impala by confirmed receipt e-mail to BurnsideShips@ImpalaTerminals.com, a Berth Application stating the projected ETA of the Vessel. The Berth Application must be received by Impala no later than 15 days prior to the projected ETA of the Ocean Vessel. An executed original of the Berth Application must follow by U.S. Mail to the following address:

           Attn: Transportation Manager
           Impala Terminals Burnside LLC
           4258 Highway 44
           Darrow, Louisiana 70725

Acceptance by Impala of a Berth Application shall be evidenced by Impala's issuance to the Vessel Party of a

Berth Application acceptant notice ("Acceptance Notice") confirming the projected ETA as the scheduled ETA. The Vessel shall send to Impala by e-mail updated ETAs as follows: 10 days, 5 days, 48 hours, 24 hours, 12 hours, 6 hours prior to arrival.

**3.3    Vessel Scheduling**

Subject to Section 5.7, Impala will endeavor to berth Ocean Vessels in order of nomination acceptance, subject to (i) timely receipt of ETA updates, (ii) arrival within the agreed-upon Laycan, and (iii) compliance with the other terms hereof; provided, however, that Impala shall have the right to assign Vessels to the Berth or Buoys, in its sole discretion, for whatever reasons, in whatever order it determines, including subject to conditions at the Terminal including Terminal, port, or river closures, Terminal or port restrictions, Terminal or port congestion, or weather and river conditions and other conditions beyond Impala's reasonable control.

**3.4.    Certification for Filing**

In the case of an Ocean Vessel, the following certificates and documents must be presented to Impala to file for a berth at the Terminal:

    i.   An original Berth Application signed by the authorized Vessel Party.

    ii.   A copy of the NOR executed by the authorized Vessel Party.

    iii.   A customary hold cleanliness certificate.

    iv.   International tonnage certificate.

    v.   A proposed stowage plan which includes Cargo cubic capacity for any Ocean Vessel to be loaded and the loading sequence or the actual plan for Cargo to be unloaded including the unloading sequence.

    vi.   Should it be necessary for Vessel personnel to leave the Vessel or Visitors, including Vessel's agent, to board the Vessel, 24 hours prior written notification to Impala must be provided and include a list of the: (a) name, (b) address, (c) telephone number and (d) reason for visit. Each visitor to the Vessel and Vessel personnel leaving the Vessel must be on the a visitor list ("Visitor List"). Each Visitor must have a form of identification acceptable to Impala. The Visitor List shall be supplemented as needed and furnished in advance of the visit to Impala in writing between 7:30 a.m. and 4:00 p.m. Mondays through Fridays, excluding Holidays. Any Vessel personnel leaving the ship shall be required to furnish Impala with a Crewman's Landing Permit — Form 1-95 issued by the U.S. Immigration & Naturalization Service and a picture identification card.

    vii.   Any special loading or unloading instructions, including instructions regarding the specific location of structural or other protruding objects in the Vessel's cargo hold(s) that could be damaged during loading or unloading.

**3.5.    Notice of Readiness**

Once the Ocean Vessel to be loaded is (a) located at the Berth, the Buoys, or the closest available safe anchorage to Darrow, Louisiana, and (b) ready and suitable in all respects to commence loading, the master of the Ocean Vessel shall tender a NOR whether cleared at customs or not, whether in free pratique or not, whether in port or not, and whether in berth or not. Impala shall not be required to accept the NOR unless and until the NOR is tendered within the applicable Laycan.

{N2933155 7}

[Page 59 of 76] · [7.3.14] (14  Execution version - Amended and Restated Terminal Services Agreement dated 30 June 2016 pdf]

**3.6.** **Laytime; Demurrage for Failing to Meet the Guaranteed Loading Rate; Despatch**

Laytime commences upon the earlier to occur of: (a) 12 hours after the Ocean Vessel has properly tendered a NOR, or (b) when a Vessel is secured All Fast and is ready to load in all respects, provided that time consumed for the following shall not count as Laytime (or time on demurrage):

  i.   Time consumed by the Ocean Vessel in moving from port anchorage to the Berth, including waiting for tide, traffic, or daylight, and time consumed during draft surveys;

  ii.  If loading starts before the completion of the 12-hour period after NOR ("turn time"), then only actual time used shall count as Laytime until expiration of such turn time;

  iii. Any delay due to inability of the Ocean Vessel's facilities to safely discharge or receive Cargo for any reason;

  iv.  Any time consumed in interruption of transportation operations due to the Vessel's failure to comply with terminal regulations (including, but not limited to, these Rules);

  v.   Delay due to prohibition of Cargo transfer at any time by the Vessel, the owner or operator of the Vessel, or by governmental authorities, unless such prohibition is caused by Impala's failure to comply with applicable laws;

  vi.  Delays due to awaiting customs and/or immigration clearance and pratique, if applicable;

  vii. Any delay caused by strike, lockout, stoppage or restraint of labor of the Master, officers and crew of the Vessel or pilots or any delay for which a Vessel Party, the Vessel, her Master or crew is responsible; or

  viii. Any delay caused by conditions not reasonably within Impala's control, including but not limited to, weather, equipment failure, awaiting tide, Force Majeure, blockage of channels caused by spills or accidents, etc.

Laytime ends when the Ocean Vessel has completed loading.

Subject to the foregoing, the amount of Laytime for a given Ocean Vessel equals the actual quantity of Cargo to be loaded onto the Ocean Vessel divided by the pro rata guaranteed load rate set forth in Section 2.3.

To the extent Impala exceeds the applicable amount of Laytime for an Ocean Vessel, Impala will reimburse Vessel Party for actual vessel demurrage incurred, invoiced, and paid in accordance with the demurrage rate as set forth in the charter party provided by Vessel Party to Impala prior to Ocean Vessel's arrival at the Terminal. Upon request from Impala, Vessel Party shall immediately supply Impala with a copy of the charter party. Notwithstanding the foregoing, the demurrage shall be reasonably in line with the daily hire rates for the Ocean Vessel at the time of entering the charter party. Vessel Party shall pay despatch compensation to Impala for time saved by exceeding the applicable guaranteed loading rate at an amount equal to 50% of the demurrage rate in the applicable charter party documents.

Notwithstanding anything to the contrary, Vessel Party waives any demurrage claim to which it may be entitled if Vessel Party does not provide notice to Impala on or before 60 calendar days after the date on which the applicable Ocean Vessel completes loading.

{N2933155 7}

# STEMMOR CHARTER PARTY (1983)

Adapted from
C. (Ore) 7
Mediterranean
IRON ORE

Copenhagen, 26th July 2019 ...................................19 ............................

1.   IT IS THIS DAY MUTUALLY AGREED BETWEEN  *Integrity Bulk APS, Denmark as.,* ...........................................................................1

of ..............................., Owners / disponent owners of the M.V. *"Ever Reliance" or suitable substitute in Owners' option* flag ..............................................2

and ........................... *LAlumina LLC, Sorrento, Louisiana (USA)* ..................................... of ...............................................................Charterers as follows:          3

**Vessel's condition and eligibility to trade**

1A.  Owners warrant that the vessel is tight, staunch and strong, in class, and in every way fitted for the voyage, with her hull, machinery and equipment in a    4
thoroughly efficient state and with a full and efficient complement of Master, Officers and Crew, insofar as the foregoing conditions can be attained by the exercise of due    5
diligence. Owners further warrant that the vessel is eligible for trading to the ports and places specified for the voyage and at all times shall have on board all certificates,    6
records and other documents required for such trading.          7

1B.  Owners guarantee vessel's description. *See Clause No. 49.*                    Built................................................LOA.........................8

**Vessel's Description**

Beam................................................DWAT..................................on a summer salt water draft of..................................................................9
Single................deek..............................................................................................................................................................................10
................................................................................................................................................................................................................11
Tween................................................................................................................................................................................................12

..............................................holds aft hold with/without raised tunnel shaft.......................................................................................13

............................................hatches sizes..........................................................................................................................................14

---------------------------------------------------------------------------------------------------------------------------------------------------------------
.............................................cranes/winches and derricks of.......................................................tons lifting capacity each in single gear and suitable for working with married    15
folds.          16
Vessel is classed Lloyd's 100A1 or equivalent and Owners  guarantee that such classification will be maintained during the entire duration of this Charter Party.    17
Should this classification not be maintained during the specified period then Owners to be liable for any and all extra insurance penalties or assessments directly resulting    18
from the fact that the vessel's guaranteed classification has not been maintained.          19

**Port of Loading**

2.          This ship shall proceed with all convenient speed to *One safe berth(s) port Kamsar, Guinea.*          20
*Owners to satisfy themselves about all prevailing restrictions, including draft restrictions which are to be entirely at Owners risk.*
and there load, always afloat from ashore and/or alongside other vessels and/or craft, as directed by Charterers or their designated representative at          21

| | | |
|---|---|---|
| | .................................................................................................................................................................... ~~berth(s) and/or at a safe anchorage, a full and complete~~ cargo | 22 |
| | *of ...... 58,000 metric tons 10 % more or less in Owner's option low mono grade Bauxite in bulk*.................................................................. | 23 |

**Discharging**  Upon completion of loading the ship shall proceed at her normal service speed to *One safe berth Impala Terminal, Burnside,*
*Owners to satisfy themselves about all the prevailing restrictions, including draft which are to be entirely at Owners risk.*  **24**
and there deliver the cargo ~~always afloat~~, ashore ~~and/or alongside other vessels and/or craft~~, as directed by Charterers or their designated representative at ........................................  **25**
.......................................................................................................... ~~berth(s) and/or at a safe anchorage.~~  **26**
After arrival written notice is to be given at all ports to Charterers' agent there *on a 24 hour basis* ~~during the periods, excluding holidays, Monday to Friday 9 a.m.~~  **27**
~~to 5 p.m. (or local's~~
~~weekend equivalent periods)~~ of the vessel being in all respects ready to load or to discharge. Prior to tendering Notice of Readiness the vessel's holds are to be washed, swept  **28**
and clean to Shippers' satisfaction for the intended cargo to be loaded. Unless otherwise provided for in this Charter Party the Master shall, upon giving Notice of Readiness,  **29**
declare in writing the exact quantity of cargo he requires within the limits stipulated herein. In the absence of such a declaration on the part of the Master the Charterers  **30**
shall be deemed to have fulfilled their obligations under this Charter Party if they load the minimum quantity stipulated in this Clause. *See also Clause Nos. 41 & 45.*  **31**

**Freight**  *3.*   Freight to be paid at and after the rate of *USD 15.25.*  **32**
*All per metric ton intaken weight free in out Spout/Chute/Grab trimmed, whichever is applicable at Loading port.*
~~per ton of 1,016 Kiles delivered~~, in full of all port charges, pilotages, consulages, light dues, lighterage, and all other dues usually paid by Steamers, *freight deemed*  **33**
*earned on shipment discountless and non-returnable vessel and / or cargo lost or not lost.* ~~Charterers to have the~~
~~option to pay the freight on Bill of Lading weight less one percent in lieu of weighing, such option declarable before breaking bulk.~~  **34**

~~75 (seventy-five)~~ 95 *(ninety-five)* per cent freight *less commission* payable on *in-taken* ~~Bill of Lading~~ quantity within *three* banking days of receipt of ~~telegraphic~~ *written* confirmation *by email*  **35**
from Owners of signing
and surrender of ~~clean~~ Bills of Lading, claused "Freight *payable* ~~prepaid~~ as per Charter Party", balance payable after completion of discharge and receipt by Charterers of all  **36**
closing
accounts, *but latest within 10 days after Owners and Charterers have found an agreement of the final freight statement* less amounts due under Clause 27 if  **37**
any. Despatch (estimated or actual) and amounts due under Clause 22 if any are deductible from any payment or freight. *Both parties will endeavor their best to close the file as soon as possible.*

Freight is to be paid to the account of *Owners as per Clause No. 51. Beneficiary in Owners' freight invoice which must be issued on Owners letterhead must be the same as Owners inserted*  **38**
*in the Charter Party. initial freight will be paid less commission. If "freight prepaid" Bills of Lading are required, then agents at load port to hold Bills of Lading in their custody until*
*Owners' bankers confirm receipt of 100% irrevocable freight payment into Owner's nominated bank account.*
.......................................................................................................................................................  ....................................................................

**Cash Advance**  *4.*   Sufficient cash for Ship's disbursements to be advanced by Owners to Agents at ports of loading and discharging prior to vessel's arrival, *as per port regulations,* failing which  **39**
Charterer
are not to be responsible for any delays to the vessel caused by Owners failure to place Agents in funds prior to ship's arrival. Charterers have the right to and may if agents  **40**
request deduct loadport disbursements from advance freight and discharge port disbursements from the balance of freight adding five per cent to cover expenses. This right  **41**
does not relieve Owners of their obligations herein described nor constitute any responsibility or liability on the part of the Charterers.  **42**

**Loading and**  *5.*   ~~The Cargo to be shipped at the rate of~~ .....*See Clause No. 41 loading and discharging terms.* ~~Tons and to be discharged at the rate of~~ .........................................................  **43**
**Discharging**  ~~tons per clear weather working day of 24 consecutive hours, Sundays and Holidays always excepted.~~ Time lost at any time by reason of all or any of the following causes shall  **44**
not be computed in the loading or discharging time *unless vessel already on* ~~or as~~ demurrage, viz: War, Rebellion, Tumults, Civil Commotions, Insurrections, Political Disturbances, Epidemics,  **45**
Quarantine, Riots, Strikes, Lock-outs, stoppage of Miners, Workmen, Lightermen, Tugboatmen, other essentials to the Working, Carriage, Delivery, Shipment or  **46**
Discharge of the said Cargo whether partial or general, or Accidents and/or breakdowns at the Mines, at Shippers or Receiver's Works or Wharf, Landslips, Floods, Frost or  **47**
Snow, Bad Weather, Interruption of River and/or Canal Navigation, Intervention of Sanitary, Customs, and/or other constituted Authorities, Partial or Total Stoppage on  **48**
Rivers, Canals or on Railways, or any other cause beyond control of Charterers. Calculation of time at each end shall be based on weight inserted in Bill of Lading and shall  **49**
not be subject to adjustment with weight agreed for freight settlement. In case of deadfreight then the time allowed for loading and discharging shall be calculated on basis of  **50**
tonnage for which freight is paid and not on the actual quantity loaded.  **51**

| | | |
|---|---|---|
| **Commencement of Laytime** | 6. ~~Time for loading to count from 8 a.m. on next working day after the Ship is reported and ready, and in free pratique and written notice tendered and accepted (whether in berth or not), and for discharging from 8 a.m. on next working day after Ship is reported and in every respect ready, and in free pratique, and written notice tendered and accepted (whether in berth or not). Steamer to be reported during official hours only. In case Shippers/Charterers can arrange to load or discharge on Sundays (or local equivalent) or Holidays, or before time commences to count, Captain to allow work to be done; such time used is not to count. Time between 5 p.m. Friday and 8 a.m. Monday (or local equivalent weekend conditions) and between 5 p.m. day preceding a holiday and 8 a.m. next working day is not to count, even if used. It is understood that "holiday" includes local, and/or labour, and/or national, and/or public holidays.~~<br>*See Clause No. 41.......................................................................................................................................................................................*<br>*Time for loading / discharging to stop counting once the physical operation has been finished..........................................................................*<br>*.................................................................................................................................................................................*<br>*.................................................................................................................................................................................* | 52<br>53<br>54<br>55<br>56<br>57 |
| **Winch Clause** | 7.   The ship to unload and/or load barges sent alongside with all possible despatch (should this mode of shipping be used); and any delay incurred by not doing so is not to count as part of laytime or demurrage. The ship to load and discharge as rapidly as possible, and give use of winches and motive power free of expense, and crew to drive the winches, if permitted by local labour regulations, otherwise shore hands to be employed, and Charterers to pay cost of same. The ship to keep the winches in good working order. Vessel shall keep all gear in good working order and shall also supply free of expense motive power, guymen, winches, *cranes*, ~~derricks~~, gins, falls, runners, slings, and power to operate all usual deck appliances including lights whenever and wherever on board the vessel as required by Charterers for loading, trimming and discharging. Owners to provide deck hands to open and close hatches. Any time lost by reason of breakdown of  winches and/or *cranes* ~~derricks~~ to be recorded respectively per hatch on the sheet of the daily working report and not to count, pro rata, as laytime or demurrage. If owing to breakdown of vessel's winches and/or ~~derricks~~ *Cranes* shore appliances are employed then the cost of same to be for Owners' account.<br><br>Owners undertake that ~~cargo gear and~~ all other equipment shall conform with regulations at all ports visited by the vessel, and that the vessel is at all times in possession of valid certificates to comply with such regulations. If shore personnel are not permitted to work due to failure of the Owners to comply with the aforesaid regulations, or because of lack of said certificates, any time so lost shall not count as laytime or demurrage and all extra expenses incurred, directly resulting from such failure, shall be for Owners' account. | 58<br>59<br>60<br>61<br>62<br>63<br>64<br>65<br><br>66<br>67<br>68<br>69 |
| **Demurrage** | 8.   ~~Demurrage (if any) at the rate of USD .................................................................................per running day or prorata for part of a day to be paid to Owners. Owners to pay Charterers despatch money at half demurrage rate for all laytime *working time* saved both ends. Demurrage/despatch to be settled after completion or the voyage and receipt of loading and/or discharging documents.~~ *Demurrage, if any, shall be paid for all time used in excess of the laytime allowed, fractions pro rata, at a rate according to the Weighted Time Charter Average of the Baltic Exchange Panamax Index on the nomination of the final performing vessel. Settlement to be done latest within 5 banking days after Owners and Charterers have found an agreement on the final freight agreement.*<br><br>9.   Laytime to be *non-*reversible ~~at Charterers' option. Such option is declarable after receipt of Statement of Facts for all ports.~~ | 70<br>71<br>72<br><br>73 |
| **Laydays and Cancelling** | 10.   Laydays not to commence without Charterers' written consent before *00:01 hours, local time 27th August 2019* and if any wilful misrepresentation be made<br><br>in respect of the size, position, etc., or should the vessel not be in loading port ready to load latest *24:00 hours, local time 02nd September 2019*.................................. it shall be at the option of the Charterers whether or not they will load the vessel. *Should the vessel be delayed and will miss her cancelling date, Owners to inform Charterers immediately, giving full itinerary, agents, present discharge port and Charterers to advise within 1 working day whether they extend the cancelling date or cancel the vessel.* | 74<br><br>75<br>76 |
| **Bills of Lading** | 11.   The Captain to sign Bills of Lading ~~at any Freight required by Charterers, not less than Chartered rate.~~ Charterers have the right to sublet this Charter Party to others in full or in part, ~~at any rate of freight without prejudice to this Charter,~~ they remaining fully responsible for due fulfillment of same. *Bills of Lading has to be in strict conformity with Mate's Receipt. Charterer's option to issue Clean Bills of Lading and Master has the right to clause Mate's Receipt where necessary.* | 77<br>78 |

Should Bills of Lading not arrive at discharging port in time then Owners agree to release the entire cargo without presentation of the original Bills of Lading *after having received an acceptable signed Letter of Indemnity from Charterers in Owners P&I Club wording. Draft Letter of Indemnity to be sent to Owners for their approval.*   79

**Agents**

*Charterers' agents at load port. Charterers' agents at discharge port. But disbursements to be in line with market.*
12.   Charterers are to nominate and appoint the Vessel's agents at Port of Loading and Discharging. Owners paying customary Agency fee. *Fees to be competitive and commensurate with normal port agency fees.* ~~If proceeding to Turkey~~   80

~~Owners to pay Agency and Supervision fees as per the official scale of charges laid down in Turkey.~~ Agents at loading port will be "*Compagnie Des Bauxtes De Guinee*"   81

Agents at discharging port will be *Gulf Harbor Shipping. LLC  details as per Clause No. 60.* ..................................................................................................................   82

**General**

**Average**

13.   General average shall be settled and adjusted according to York-Antwerp rules, 1974 (*and later amendments thereto)*, at and as supplemented by custom and practice at the port of   83
~~required by Charterers, Owners will forego general average deposits from one or more cargoes and will accept a general average undertaking from Charterers in the~~   84

~~customary form. If required by Charterers, Owners agree to release one or more cargoes to Charterers for transshipment from a port of refuge by and at the expense of~~   85
~~Charterers, in exchange for a non separation of interest agreement and a general average undertaking from Charterers in the customary form. The transshipment expenses~~   86
~~shall not be included in the general average except to the extent of the other general average expenses thereby saved.~~   87
14.   Master to telegraph, *e-mail and / or fax* "Charterers," as well as Charterer's agents at Port of Loading, should he have to put in at any Port or Ports.   88

15.   In case of Jettison, the Captain to report the same to Receivers and "............." immediately.   89

**Overtime**

16.   The ship to work at night if requested to do so. Overtime to be for account of party ordering same, but if ordered by Port Authorities ~~50 per cent~~ shall be paid by   90

Charterers ~~and 50 per cent by the Owners~~. Overtime earned by the Officers and Crew shall always be entirely for Owners' account.   91
17.   Shippers/Charterers/Receivers to put the cargo on board, *spout / chute / grab* trim and discharge cargo free of expense to the vessel. Trimming is understood to mean   92

levelling of the top of the pile and any additional trimming required by Master is to be for Owners' account.   93

**Commission**

18.   A Commission of ............... ... *2.5* ...............per cent on the gross amount of freight, dead freight, and demurrage is due on shipment, ship and/or cargo lost or not lost to   94

................. ~~Commission, due to~~ .............*Dan-broker, Copenhagen*.......................... on freight and is deductible from advance freight payment and commission due to ................... on,   95

deadfreight and/or demurrage, if any, is deductible from balance of freight.   96

**Notices**

19.   Ship to apply to  *agents at loading port* ..................................................................................................................................... for cargo.   97

Owners or Master to give to loading port agents **agencemaritimekamsar@cbg-guinee.com** and **zach.mayer@argintl.com** and **danbroker@danbro.dk** *7/5/3/2/1 day(s)* ..............   98

days notice of vessel's expected date and time of arrival together with approximate quantity of cargo required on giving the...................................................................................... days notice.   99

Master also to give to discharging port agents **neworleans@gulfharbor.com** and **zach.mayer@argintl.com** and **danbroker@danbro.dk** *7/5/3/2/1 day(s)*   100

days notice of expected date and time of arrival at discharging port. Upon sailing from the loading port Master will  cable "                                            " stating the exact quantity   101
of cargo loaded and his E.T.A. at discharging port. In the event of Owners or Master failing to give the aforementioned notices, Charterers are to be allowed 24 hours extra   102
laytime for loading or discharging.   103
20.   The Act of God, the Queen's enemies, Arrest and/or Restraints of Rulers, Princes and People, Quarantine, Fire on Board, in Hulk or Craft or on Shore, Ice,   104

Barratry of the Master and Crew, Enemies, Pirates, Robbers by land or sea, accidents to and damage and detention from Boilers, and of Machinery, Collisions,   105
Jettison, or from any act, neglect, default or error in judgment whatsoever of the Pilot, Master, Crew or other servants of the Shipowners in the management and/or the   106

navigation of the vessel, and all and every other Dangers and Accidents of the Seas, Rivers and Canals of whatever nature and kind whatsoever, before and during the said voyage always mutually excepted. Vessel has liberty to call at any port or ports, in any order, or places, to bunker, or to deviate for the purpose of saving life or property, with leave to sail without Pilots, and tow or to be towed and assist vessels or to be assisted in all situations whatsoever. Salvage and/or towage for Owner's sole benefit. `107` `108` `109`

21. All liability of Charterer shall cease on completion of loading except Charterers to remain responsible for payment of freight, deadfreight and demurrage if any. Deadfreight/demurrage to be settled after completion of the voyage and receipt of loading and/or discharging documents. `110` `111`

**Insurance**

22. ~~Any extra insurance premium on cargo on account of vessel's age, flag, class or ownership to be for Owner's account.~~ `112`

**Bad Weather**

23. The Captain shall cover the hatch of each hold as soon as the loading into same has finished, and also all hatches when the loading or discharging has finished for the day, if the weather be wet or threatening; he shall also, during rain or snow, cover up all hatches by which loading or discharging is not actually going on. It is agreed that the Captain may send someone to check the weight of the cargo on delivery so as to avoid dispute, and weight as ascertained to be conclusive. `113` `114` `115`

24. Owners accept the risk of detention which may arise if by reason of insufficient depth of water the vessel cannot get to a usual loading and/or discharging berth, as ordered, when same available. `116` `117`

25. If through congestion at the Port of Discharge *or for other reason beyond the Owners' responsibility* vessel is kept waiting off the port lay days are to commence to count as per Clause 4~~1, 6, but not until 36 hours from~~ `118`

~~arrival (Sundays, or local equivalent and holidays excepted).~~ `119`

26. In the event of any general strike, riot, insurrection, revolution or war, which may prevent the Shipment of cargo under this Charter, the Owners in the event of no cargo having been loaded, have the option of cancelling this Charter or if any cargo has been loaded they have the right to proceed on the voyage with the cargo so loaded. In the latter case the time to count as lay days to be mutually agreed between Owners and Charterers. `120` `121` `122`

**Grab Discharge**

27. Vessel is guaranteed suitable for grab discharge and is to tender clear of sweat battens. No cargo is to be loaded in deeptanks, bunkers or other compartments not easily accessible to grabs. If the cargo is loaded and trimmed in tweendecks any extra expenses incurred at loading port and time lost to be for ship's account also any extra trimming necessary on account of vessel's construction *including open brackets, if any* to be for Owners' account and time so occupied to be for Owners' account. Any extra expenses and/or loss of time over `123` `124` `125`

and above the cost of normal grab discharge incurred at discharging port for cargo not easily accessible to grabs or loaded in the tweendecks is to be for Owners' account also any extra expenses incurred solely owing to vessel's construction and amounts involved may be deducted from the balance of freight pending final adjustments. All extra time lost under this Clause to be added to the laytime. Deeptanks, tunnels and all other provisions within vessel's holds are to be sheltered against damage by Receivers' grabs, failing which Owners are to be responsible for all consequences. Any disputes regarding stevedoring damage to be settled directly between Owners and Stevedores and any time occupied in repairing Stevedoring damage not to count as laytime. *In case, Owners are unable to get a settlement directly with stevedores for proven damage, Charterers shall endeavor to assist Owners in obtaining settlement.* `126` `127` `128` `129` `130`

**Arbitration**

28. All disputes from time to time arising out of this Contract shall, unless the parties agree forthwith on a single Arbitrator, be referred to the final arbitrament of two Arbitrators carrying on business in London who shall be members of the Baltic Exchange and engaged in the shipping and/or grain trades, one to be appointed by each of the parties with power to such Arbitrators to appoint an Umpire. Any claim must be made in writing and Claimant's Arbitrator appointed within twelve months of final discharge and where this provision is not complied with the claim shall be deemed to be waived and absolutely barred. No award shall be questioned or invalidated on the ground that any of the Arbitrators is not qualified as above, unless objection to his acting be taken before the award is made. *The rules for arbitration proceedings of the L.M.A.A. to apply.* `131` `132` `133` `134` `135`

**Protective Clauses**

29. New Jason Clause, Both-to-Blame Collision Clause, P & I Club Oil Bunkering Clause and *Voywar 2004* ~~Chamber of Shipping War Risks Clauses 1 and 2~~ are to be deemed incorporated in this Charter Party. `136`

30. The Pilot, Master, Officers and Crew of the vessel, and any tow boat person or facility assisting the vessel, shall not be agents or employees of Charterers and the Charterers shall not be liable for any loss, damage or claims resulting from or arising out of negligence or error of any of them while vessel is proceeding to or lying at any place of loading and/or discharging. `137` `138` `139`

31. While the Surveyor is taking draft readings and/or tank soundings, Master is not to take on or pump ballast at load and discharge ports without obtaining permission of the Charterers, and vessel is not to take on, release or switch from one tank or other compartments to another any ballast, fresh water or fuel oil. `140` `141`

32.   Vessel to furnish a certified calibration scale for all tanks including fore and aft peaks and double bottom tanks and deeptanks; Plimsoll marks amidships and draft marks on port and starboard sides bow and stern to be clearly cut and marked on shell plating. Vessel to furnish capacity plan, displacement scale and deadweight scale and same to be certified by the Master as to correctness at time of loading.   142 143 144

33.   ~~When loading Pig Iron and/or scrap Charterers have the right to dump the cargo after safe flooring secured.~~ Stowage to be under the direction of the Master.   145

34.   ~~Magnet loading and/or discharging is permitted and the Vessel is to provide all power required by Shippers and/or Receivers and/or Charterers.~~   146

35.   ~~Owners warrant that vessel has not called at Cuba or North Vietnam since 1st January, 1962.~~   147

36.   If vessel calls at any U.S. port for purposes of loading and/or discharging and/or embarking or disembarking passengers, vessel's cargo gear and all other equipment must comply with regulations established by U.S. Public Laws 85-742 Part 9 (Safety and Health Regulations of Longshoring). If longshoremen are not permitted to work due to failure of Master and/or Owners' Agents to comply with the aforementioned regulations, any delays resulting therefrom shall be for Owners' account.   148 149 150

37.   Owners warrant that they have secured and carry aboard the vessel a U.S. Federal Maritime Commission's Certificate of Financial Responsibility as required under the U.S. Water Quality Improvement Act of 1970. In any case Owners shall be liable for any and all consequences arising from their failure to obtain the aforementioned certificate.   151 152 153

38.   ~~If vessel is required to shift between berths at either loading port or discharging port time is not to count as laytime and shifting expenses are to be for Owners' account.~~   154 155

39.   Owners warrant that the vessel will not be scheduled for breakup upon completion of this Charter. Charterers are granted a maritime lien on the vessel and are entitled to deduct from any sums due to Owners for all damages arising from a breach of this warranty.   156 157

40.   Opening and closing of hatches to be for Owners' account *provided permitted by local authorities*   158

**Part Cargo Clause**

41.   ~~In the event of a part cargo option being agreed during negotiations the following conditions are deemed to have been accepted by Owners:~~   159

~~(a)   Owners have the option to complete with other lawful general merchandise at their risk and expense from a port en route to a port en route. Any such completion cargo is to be non injurious to cargo carried under this Charter party, and is not to be loaded in same compartments as cargo loaded under this Charter Party. If such completion cargo is in bulk then this is not to be stowed in tweendecks above cargo loaded under this Charter Party, and if such completion cargo is in bags or casks or drums i.e., not bulk and same is carried in tweendecks then the tweendeck hatch covers are to be securely covered by tarpaulins to avoid seepage of cargo into lower holds. At all times Owners are to be fully responsible for any contamination of cargo loaded under this Charter Party due to completion cargo being carried. Such completion cargo is not to be loaded or discharged at same time as cargo carried under this Charter Party.~~   160 161 162 163 164 165

~~(b)   At loading port letter of readiness is not to be presented (or accepted) until all compartments into which cargo will be loaded under this Charter Party are actually free and unimpededly available. At discharging port letter of readiness is not to be presented (or accepted) until any cargo over stowing or otherwise impeding discharge of cargo under this Charter Party has been discharged or otherwise removed.~~   166 167 168

~~(c)   If other cargo is to be loaded and/or discharged at same berth or by means of same shore loading or discharging equipment prior to the cargo under this Charter Party then the notice of readiness under this Charter Party can only be tendered (or accepted) when such other cargo has been finally loaded and/or discharged.~~   169 170

**Bagged Cargoes**

42.   ~~In the event of bagged cargo being carried the following conditions are deemed to have been accepted by Owners:~~   171

~~(a)   Owners to take adequate precautions in order to protect bagged cargo from damage. If the vessel is not cargo batten fitted Owners to supply and lay at their expense any dunnage and mats and kraft paper necessary to ensure adequate protection of cargo. In any case it is understood that dunnage and/or mats and/or kraft paper must be sufficient to avoid any contact of the bags with plates, frames and beams so as to allow ventilation on the sides and to avoid hold moisture and to avoid bags becoming torn. Before tendering Notice of Readiness Master to take necessary measures to ensure holds are clean dry and odour free and in every way suitable to receive cargo to Charterers' surveyors satisfaction.~~   172 173 174 175 176

(b)   Owners to be responsible for number and condition of bags signed for in accordance with the Bills of Lading.    177

(c)   If the cargo is stowed in refrigerator hatches, alleyways, bunker hatches, deeptanks or other awkward places, owners shall pay the extra labour costs of loading    178
and/or discharging from such places and shall allow Charterers additional laytime for such loading and/or discharging.    179

(d)   Clean Mates Receipts to be signed for each parcel when on board, and Master to sign Bills of Lading in accordance therewith as requested by Charterers or    
Shippers. Master's right to reject any cargo that would involve the clausing of Mates Receipts and/or Bills of Lading.    180

NOTICE    181

SERIOUS LOSSES have recently been caused to Charterers by Captains signing Bills of Lading for a greater quantity than they knew to have been loaded.
OWNERS ARE REQUESTED to assist Charterers by warning the Captain not to sign Bills of Lading for one ton more then Captain believes to be on board his vessel.
THE CAPTAIN should carefully calculate from ships' displacement the weight of cargo, and make sufficient allowance for weight of bunker coal, water, stores.
OWNERS ARE PAID freight on the output weight and where Captains sign for an excessive quantity, dues, paid by the vessel on such excess are not recoverable.
    A true copy of Original Charter in ........................................................................................................................................................................ possession.

*Additional clauses nos. 41 through 61, as per attached Rider, are deemed to be fully incorporated in this charter party and form part of same.*

*THE OWNERS:*                                                                                   *THE CHARTERERS:*

This document is a computer generated STEMMOR 83 form printed using software which is the copyright of Strategic Software Ltd. (SSL). Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the preprinted text of this document, and which is not clearly visible, then the original STEMMOR 83 approved document shall apply. SSL assume no responsibility for any loss or damage caused as a result of discrepancies between the original document and this document.

**Additional Clauses to "M.V. Ever Reliance or Sub"**
**Account: "LAlumina LLC, Sorrento, Louisiana (USA)"**
**Charter Party Dated: "26ᵗʰ July 2019"**

## Clause 41

The cargo to be loaded at the rate of 20,000 metric tons per weather working day of 24 consecutive hours, Sundays and holidays included, Laytime shall commence 12 hours after Notice of Readiness acceptance. Otherwise as per attached Kamsar CBG loading conditions.

In case Shippers / Charterers can start loading prior commencement of laytime, such actual time used to count.

In case load berth is occupied, notices to be tendered and accepted whether in berth or not, whether in port or not, whether in free pratique or not, whether customs cleared or not.

Time proceeding to berth or awaiting entry and free pratique by custom authorities, ballasting or de-ballasting, the vessel's condition or breakdown or inability of the vessel's facilities to load cargo within the time allowed, strike, lockout, stoppage or restraint of labour of Master, officers or crew of the vessel or tugboat or of pilots, poor weather conditions shall not count as used laytime, unless the vessel is already on demurrage.

The cargo to be discharged at the rate of 11,000 metric tons per weather working day of 24 consecutive hours, Sundays and holidays included, 12 hours turn time. Otherwise as per attached Impala terminal discharging terms for Bauxite imports.

"Kamsar CBG loading conditions – Third Party sales" as well as "Impala Terminal Discharging terms for Bauxite imports", as attached, to overrule and form part of the Charter Party, where applicable.

Where applicable replace the word "seller" with "Charterers" and the word "buyer" with "Owners"

Notice of Readiness shall be tendered 24-hour basis. If the berth is congested then vessel may tender at customary waiting place whether in berth or not, whether in port or not, whether in free pratique or not, whether customs cleared or not.

If a Notice of Readiness is tendered but the vessel is found not ready to discharge, then vessel's Notice of Readiness to be considered invalid.

Time taken by vessel to move from pilot station or from the place of temporary stoppage (if any) ordered by the port to the berth shall not count as laytime.

Time taken by vessel to open and close the hatches shall not count as laytime.

Charterer has the right to conduct draft survey on vessel at the discharge port and time to count as laytime.

**Additional Clauses to "M.V. Ever Reliance or Sub"**

**Account: "LAlumina LLC, Sorrento, Louisiana (USA)"**

**Charter Party Dated: "26th July 2019"**

Discharge shall be completed when the vessel is left clean to the reasonable satisfaction of the Master and all shore equipments have been removed. Pay loaders used in vessel's holds to be equipped with rubber tyres.

**Clause 42**

Vessel not to load any other cargo(es) whatsoever.

**Clause 43**

Owners warrant that the vessel is suitable for the carriage of Low Mono Grade Bauxite in bulk. Before tendering Notice of Readiness at load port, cargo compartments to be clean, clear, completely dry and in good condition and in every respect ready to load Low Mono Grade Bauxite in bulk to Shippers' / Charterers' Surveyor's satisfaction at any time before and during loading.

**Clause 44**

Any war risk insurance, extra war risk insurance for vessel and crew including full piracy / ransom insurance to be fully for Owners' account.

**Clause 45**

If the discharge berths are congested, Notice of Readiness can be tendered upon arrival at anchorage within port limit at any time Fridays and holidays included, basis whether in berth or not, whether in port or not, whether in free pratique or not, whether customs cleared or not.

**Clause 46**

Vessel shall be warped alongside the loading / discharging installation as required by Shippers / Receivers, always under Master's satisfaction, expenses to be for Owners' account, but time to count as laytime or time on demurrage. Overtime, if any, payable to officers and crew and bunkers so consumed shall be for Owners' account.

**Clause 47**

In the event of a boycott arising due to vessel's flag, time lost through such cause shall not count as laytime or as time on demurrage. This clause shall also be applicable in the event of labour boycott or any other discrimination against the vessel because of her registry and / or crew and / or terms on which the crew is employed.

**Clause 48**

This fixture and its details to be kept strictly private and confidential by all parties concerned.

**Clause 49        Vessels description:**

| | | |
|---|---|---|
| Vessel | : | MV "Ever Reliance" |
| Flag | : | Panama |

**Additional Clauses to "M.V. Ever Reliance or Sub"**

**Account: "LAlumina LLC, Sorrento, Louisiana (USA)"**

**Charter Party Dated: "26ᵗʰ July 2019"**

| | | |
|---|---|---|
| Built | : | 2011 |
| Deadweight | : | 57,991 metric tons on 12.83m SSW |
| TPC | : | 57.46 |
| LOA | : | 189.99 M |
| Beam | : | 32.26 M |
| Holds / Hatches: | | 5 / 5 |
| Cranes | : | 4*30 MT and 4 grabs each 12 CBM |
| Grain/Bale Cap.: | | 72,688.0CBM / 70,121.0 CBM |

Or Owners option suitable substitute.

All about further description as per attached questionnaire,

- Or in Owners' option suitable geared or gearless substitute, performing vessel and any subsequent substitution to be subject to shippers/receivers approval within 1 working day after receipt of complete nomination, which to include full description, preferably (baltic99), and the following documents:
Rightship, H&M, COFR, ITC, P&I, Class, ISPS, ISSC, DOC, ISMC.

-Owners undertake that the beam of the performing vessel shall not exceed 32.26 metres

- Maximum 15 years old during the performance of this Charter Party.
- Geared or gearless single-deck self-trimming bulk carrier.
- Engine / bridge aft.
- Steel floored throughout all holds.
- Vessel has no fore and aft hold divisions and vessel is not classed as woodchip-carrier.
- Vessel has no centerline nor longitudinal bulkhead or beam, horizontal corrugation, no fixed stanchions (=only collapsible) alongside the holds/hatches (fixed/permanent stanchions in front of the crane houses only), posts or other elements protruding into holds and/or way of hatch openings.
- Vessel to have clear/unobstructed holds without any container-fittings or other obstacles.
- Owners warrant that vessel has no twin-hatches.
- Owners warrant that the vessel has no pontoon-hatchcovers.

Classed highest Lloyds register +100A1 or equivalent being a member of the I.A.C.S. and to be so maintained throughout this Charter Party fully P+I insured with Lloyds underwriters or other first class P&I club being a member of the international group of P&I clubs and to be so maintained throughout this Charter Party vessel to be I.S.M. Compliant and to be in possession of a valid International Ship Security Certificate (ISSC) or their Interim International Ship Security Certificate (IISSC), copy of which to be mailed to Charterers together with the names of the last 5 ports of call, last 5 cargoes, copy of valid ISM certificate, copy of valid IMCO code certificate, all to be submitted to charterers for application of subjects of stem/shippers/receivers approval.

**Additional Clauses to "M.V. Ever Reliance or Sub"**
**Account: "LAlumina LLC, Sorrento, Louisiana (USA)"**
**Charter Party Dated: "26th July 2019"**

Owners also have to duly fill in the necessary loadport questionnaires, which are constituting a part of a valid nomination.

- Vessels to be accepted by Rightship.

- The vessel including her holds, hatches and all other equipment to be suitable and fitted / equipped in all respects for the loading, carriage and discharge of Low Mono Grade Bauxite in bulk and to conform with all applicable regulations of Guinea and USA including the loading facility at port Kamsar.

- Owners warrant that they will not nominate any vessel listed on the United States Department of Treasury (OFAC) list of blocked vessels (also referred to as "SDN vessels") or any vessel owned or operated by any other Specially Designated Nationals or blocked persons (such as, by way of example, the Islamic Republic of Iranian Shipping Line). Charterers will have the right to reject any nomination of a SDN vessel or a vessel owned or operated by Specially Designated Nationals or Blocked Persons."

- The performing vessel shall be suitable in every way to enter, anchor, berth at and leave the load and discharge ports / berths / anchorage at any time. The vessels are to be presented for loading / discharging in such trim and condition as to permit loading / discharging. Master to provide all necessary information as determined by the Charterer or their servants or port authorities for safe loading, carriage and discharge of the vessel.

- It is expressly understood and agreed that vessel's draught / dimensions may not exceed the limits of the intended loading and discharge berth without Charterer's prior consent; otherwise the Owner shall be responsible for all costs, risks and loss of time in connection with lighterage or alternative berthing arrangements, including costs and risks of extra handling, transhipment and / or carriage to or from the contractually agreed point of loading or discharge.

- The performing vessel must be capable of satisfying all loading and discharging requirements of this agreement regardless of its age.

- Each nominated vessel shall fully comply with and have on board all relevant current certificates and her equipment shall comply with the rules, regulations and laws of the relevant authorities at the load and discharge ports or as may be required en route; failing which Owner shall be responsible for all loss of time and/or costs incurred by Charterer as a result thereof even if the vessel is on demurrage.

- Owner shall, at their risk and expense, comply with all applicable rules, regulations and laws relevant to pollution at ports of loading and discharge and en route. Owner warrants to have secured and carry on board a certificate of financial responsibility relating to oil pollution as required. In the event of new

**Additional Clauses to "M.V. Ever Reliance or Sub"**
**Account: "LAlumina LLC, Sorrento, Louisiana (USA)"**
**Charter Party Dated: "26ᵗʰ July 2019"**

regulations controlling the air pollution come into effect after the date of the execution of this Agreement, which may lead the Owner to believe that continued implementation of the provision of this agreement would result in a material inequity to him, then the Parties will cause their respective representatives to meet for the purpose of discussing possible means of rectifying such inequities. The Parties have an obligation to pursue all viable and reasonable efforts to reach an acceptable solution.

- The Owner shall comply with any I.M.O. Recommendations applicable to the carriage of Bauxite in bulk.

- Owner warrants that the vessel can ballast / deballast at load and discharge port sufficiently quickly to comply with Charterer's requirements including all rules, regulations and laws in force at the load and discharge port applicable to deballasting. Vessel shall be capable of ballasting and deballasting without interruption to the continuous loading / discharging operation.

- The Owner shall procure that both the vessel and "the Company" (as defined in the ISM Code) shall comply with the requirements of the ISM Code. Upon request the Owner shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterer. Except as otherwise provided in this Agreement, loss, damage, expenses or delay caused by failure on the part of the Owner or "the Company" to comply with the ISM Code shall be for Owner's account even if the vessel is on demurrage.

- Owner guarantees that the performing vessel is fully insured by first class hull and machinery insurers and will remain so during the currency of this agreement.

- The Owner warrants that the hatch-covers and seals are in good condition and watertight. On arrival at the load port and before loading, the vessel may be inspected by an independent inspection agency at Charterer's expense to confirm the condition of the hatch cover and seals, but such inspection will not relieve Owner of their obligations with regard to the seaworthy and cargo worthy condition of the vessel.

- The performing vessel shall provide lights and electrical power for night work, as required, free of expense to the Charterer. Each nominated vessel shall be maintained in good working order and allow Charterer free use of lights.

- Owner confirms that all officers and crew are employed under an agreement recognized by the ITWF (The International Transport Workers Federation) or similar. The vessel has a valid ITWF or equivalent certificate and any delay and/or extra expenses incurred due to vessel's crew wages or other vessels in the ownership or management of the Owner, and/or terms inconsistent with those laid

**Additional Clauses to "M.V. Ever Reliance or Sub"**

**Account: "LAlumina LLC, Sorrento, Louisiana (USA)"**

**Charter Party Dated: "26th July 2019"**

down by the ITWF to be for Owner's account.

- The Master shall provide and agree with the Charterer on a stowage plan (with hatch list), prior to commencement of loading, and issue and sign a statement after completion of loading wherein he confirms that the cargo was stowed in a seaworthy manner to his satisfaction.

- The performing vessel shall provide clear unobstructed tank-top floor space in all designated cargo holds. Vessel's holds to be empty, free of loose rust scale, clean, swept and dry and in all respects fit to receive the cargo, to independent surveyor's satisfaction. No other cargo or equipment shall be hindering or obstructing the access of loading equipment to vessel's holds.

- Owners guarantee that the vessel is fitted with serviceable Australian hold-ladders and that vessel's crew is employed in accordance with international transport workers federation (I.T.F.) regulations or in accordance with a union's regulation affiliated To the I.T.F. this guarantee is to be maintained throughout the whole duration of the voyage.

**Clause 50**

Vessel's crew to open and close the hatches and to remove and replace the hatch beams, as necessary for loading at Owners' risk and expenses.

**Clause 51      Owners' banking details**

TBA

**Clause 52**

Taxes and / or dues and / or wharfages on vessel / freight to be for Owners' account.

Taxes and / or dues and / or wharfages on cargo, to be for Charterer's account.

**Clause 53      I.S.M. Code**

The requirements of the International Safety Management (ISM) Code are hereby incorporated into the terms of this Charter Party. Owners warrant that on and after 1st April, 1998 a Safety Management System (SMS) in accordance with the ISM Code will be in operation. Owners further warrant that on and after 1st July, 1998 they (or the Company as defined by the ISM Code) shall have a valid Document of Compliance (DOC), and the vessel shall have valid Safety Management Certificate (SMC). In the event of any delay to the vessel and / or cargo caused by non-compliance with the requirements of the ISM Code, all consequences to be for Owners' account including but not limited to laytime and / or time on demurrage not to count.

**Additional Clauses to "M.V. Ever Reliance or Sub"**

**Account: "LAlumina LLC, Sorrento, Louisiana (USA)"**

**Charter Party Dated: "26ᵗʰ July 2019"**

**Clause 54**

Notwithstanding anything contained herein to the contrary, should the sum claimed by each party, excluding interest and cost, not exceed USD 50.000 / - the dispute is to be governed by the terms of the "Small Claims Procedure" of the London Maritime Arbitrators Association current at the time when the arbitration proceedings are commenced.

**Clause 55**

Deleted.

**Clause 56**

Time for de-ballasting not to count as laytime, even if the vessel is already on demurrage, provided loading / discharging operations are interrupted.

**Clause 57**

Time lost by the following causes not to count as laytime:

- Shifting from waiting anchorage to berth
- Draft checks before and after loading
- Ballasting or de-ballasting, if loading is actually interrupted for such reason.

**Clause 58      Set-off Clause**

Following a default by either party hereunder (the "defaulting party") the other party (the "non-defaulting party") shall be entitled, at its option, to set off any undisputed amounts believed in good faith and on reasonable grounds by the non-defaulting party to be payable (whether at such time or in the future or upon the occurrence of a contingency) by the defaulting party to the non-defaulting party (whether under this Charter Party or otherwise),  against any undisputed amounts believed in good faith and on reasonable grounds by the non-defaulting party to be payable (whether at such time or in the future or upon the occurrence of a contingency) by the non-defaulting party to the defaulting party (whether under this charter party or otherwise), irrespective of the currency, place of payment or booking office of either party's obligations and the parties' respective obligations shall be discharged promptly and in all respects to the extent they are so set-off.

The non-defaulting party will give 3(three) days prior notice to the defaulting party of any intended set-off to be effected under this provision.

For this purpose, any such undisputed amount payable by one party to the other (or the relevant portion of such amount) may be converted by the non-defaulting party, acting in good faith and in a commercially reasonable manner, into such currency as may reasonably be required in order to effect such set-off at an exchange rate determined by the non-defaulting party acting in good faith and in a commercially reasonable manner. If an obligation is unascertained, the non-defaulting party may in good faith estimate that obligation

**Additional Clauses to "M.V. Ever Reliance or Sub"**

**Account: "LAlumina LLC, Sorrento, Louisiana (USA)"**

**Charter Party Dated: "26ᵗʰ July 2019"**

and set off in respect of the estimate, subject to the relevant party accounting to the other when the obligation is ascertained.

**Clause 59     Solvency Clause**

1.      Both Owner and Charterer agree that if at any time during the Charter Party a Bankruptcy Event occurs in relation to either of them (the "Defaulting Party") the other party ("the Non-Defaulting Party") may exercise the option to terminate the Charter Party at any time by giving ~~5 calendar days'~~ notice (the "Termination Notice") to the Defaulting Party. A Termination Notice shall be valid if sent by e-mail.

1.1     Following service of a Termination Notice the Charter Party shall terminate on that ~~given~~ date (the "Termination Date"). As at the Termination date all performance obligations of both the Defaulting and Non-Defaulting Party shall terminate.

**Clause 60     Agents**

Charterer's agents Port Kamsar.

Compagnie Des Bauxites De Guinee

Kamsar Port / C.B.G.

B. P: 523 Conakry / B.P : 100 Kamsar

République De Guinée

Attn.     :     Mohamed K. Kéita

CBG Maritime Agency Supervisor

Mail    :     agencemaritimekamsar@cbg-guinee.com

Tél (Off):     (+224) 30 32 21 17

(Mob)   :     (+224) 660 58 32 32, 623 23 35 43

Charterer's agent Burnside:

Ron Soldani

Gulf Harbor Shipping. LLC

New Orleans

2000, Old Spanish Trail, suite 100

Slidell, Louisiana, 70458-8674

phone: 985-661-8005

neworleans@gulfharbor.com

**Clause 61**

Owners/Master may elect to perform voyage at economical speed, but at no less than 12 knots, weather permitting and subject all going well.

**Additional Clauses to "M.V. Ever Reliance or Sub"**
**Account: "LAlumina LLC, Sorrento, Louisiana (USA)"**
**Charter Party Dated: "26ᵗʰ July 2019"**

**New Jason Clause**

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which or for the consequence of which, the carrier is not responsible, by statute, contract or otherwise, the goods, shippers, consignees or Owners of the goods shall contribute with the carrier in general average the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or Owners of the goods to the carrier before delivery."

and the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause.

**Protection and Indemnity Bunkering Clause**

The vessel in addition to all other liberties shall have liberty as part of the contract voyage and at any stage thereof to proceed to any port or ports whatsoever whether such ports are on or off the direct and / or customary route or routes to the ports of loading or discharge named in this Charter an there take oil bunkers in any quantity in the discretion of Owners even to the full capacity of fuel tanks, deep tanks and any other compartment in which oil can be carried whether such amount is or is not required for the chartered voyage.

**Both to Blame Collision Clause**

If the liability for any collision in which the vessel is involved while performing this Charter Party calls to be determined in accordance with the laws of the United States of America, the following clause shall apply:

**New Both to Blame Collision Clause**

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship, the Owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying ship or her Owners in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the Owners of the said goods, paid or payable by the other or non-carrying ship or her Owners to the Owners of the said goods and set off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying ship or carrier.

The foregoing provisions shall also apply where the Owners, Operators or those in charge of any ship or ships other than or in addition to the colliding ships or objects are at fault in respect to a collision or contact."

**Additional Clauses to "M.V. Ever Reliance or Sub"**

**Account: "LAlumina LLC, Sorrento, Louisiana (USA)"**

**Charter Party Dated: "26th July 2019"**

and the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause.

**War Risks Clause for Voyage Chartering, 2004 (Code Name: VOYWAR 2004)**

(a)     For the purpose of this Clause, the words:

(i)     "Owners" shall include the ship-Owners, bareboat Charterers, disponent Owners, managers or other operators who are charged with the management of the Vessel, and the Master; and

(ii)     "War Risks" shall include any actual, threatened or reported:

War; act of war; civil war; hostilities; revolution; rebellion; civil commotion; warlike operations; laying of mines; acts of piracy; acts of terrorists; acts of hostility or malicious damage; blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or Ownership, or against certain cargoes or crews or otherwise howsoever); by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and / or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(b)     If at any time before the Vessel commences loading, it appears that, in the reasonable judgement of the Master and / or the Owners, performance of the Contract of Carriage, or any part of it, may expose, or is likely to expose, the Vessel, her cargo, crew or other persons on board the Vessel to War Risks, the Owners may give notice to the Charterers cancelling this Contract of Carriage, or may refuse to perform such part of it as may expose, or may be likely to expose, the Vessel, her cargo, crew or other persons on board the Vessel to War Risks; provided always that if this Contract of Carriage provides that loading or discharging is to take place within a range of ports, and at the port or ports nominated by the Charterers the Vessel, her cargo, crew, or other persons onboard the Vessel may be exposed, or may be likely to be exposed, to War Risks, the Owners shall first require the Charterers to nominate any other safe port which lies within the range for loading or discharging, and may only cancel this Contract of Carriage if the Charterers shall not have nominated such safe port or ports within 48 hours of receipt of notice of such requirement.

(c)     The Owners shall not be required to continue to load cargo for any voyage, or to sign Bills of Lading for any port or place, or to proceed or continue on any voyage, or on any part thereof, or to proceed through any canal or waterway, or to proceed to or remain at any port or place whatsoever, where it appears, either after the loading of the cargo commences, or at any stage of the voyage thereafter before the discharge of the cargo is completed, that, in the reasonable judgement of the Master and / or the Owners, the Vessel, her cargo (or any part thereof), crew or other persons on board the Vessel (or any one or more of them) may be, or are likely to be, exposed to War Risks. If it should so appear, the Owners may by notice request the Charterers to nominate a safe port for the discharge of the cargo or any part thereof, and if within 48 hours of the receipt of such notice, the Charterers shall not

**Additional Clauses to "M.V. Ever Reliance or Sub"**

**Account: "LAlumina LLC, Sorrento, Louisiana (USA)"**

**Charter Party Dated: "26th July 2019"**

have nominated such a port, the Owners may discharge the cargo at any safe port of their choice (including the port of loading) in complete fulfilment of the Contract of Carriage. The Owners shall be entitled to recover from the Charterers the extra expenses of such discharge and, if the discharge takes place at any port other than the loading port, to receive the full freight as though the cargo had been carried to the discharging port and if the extra distance exceeds 100 miles, to additional freight which shall be the same percentage of the freight contracted for as the percentage which the extra distance represents to the distance of the normal and customary route, the Owners having a lien on the cargo for such expenses and freight.

(d)    If at any stage of the voyage after the loading of the cargo commences, it appears that, in the reasonable judgement of the Master and / or the Owners, the Vessel, her cargo, crew or other persons on board the Vessel may be, or are likely to be, exposed to War Risks on any part of the route (including any canal or waterway) which is normally and customarily used in a voyage of the nature contracted for, and there is another longer route to the discharging port, the Owners shall give notice to the Charterers that this route will be taken. In this event the Owners shall be entitled, if the total extra distance exceeds 100 miles, to additional freight which shall be the same percentage of the freight contracted for as the percentage which the extra distance represents to the distance of the normal and customary route.

(e) (i)    The Owners may effect war risks insurance in respect of the Hull and  Machinery of the Vessel and their other interests (including, but not limited  to, loss of earnings and detention, the crew and their Protection and  Indemnity Risks), and the premiums and / or calls therefor shall be for their  account.

(ii)    If the Underwriters of such insurance should require payment of premiums and / or calls because, pursuant to the Charterers' orders, or in order to fulfil the Owners' obligation under this Contract of Carriage, the Vessel is within, or is due to enter and remain within, or pass through any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then the actual premiums and / or calls paid shall be reimbursed by the Charterers to the Owners within 14 days after receipt of the Owners' invoice. If the Vessel discharges all of her cargo within an area subject to additional premiums as herein set forth, the Charterers shall reimburse the Owners for the actual additional premiums paid which may accrue from completion of discharge until the Vessel leaves such area or areas referred to above. The Owners shall leave the area as soon as possible after completion of discharge.

(f)    The Vessel shall have liberty: -

(i)    To comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery or in any way whatsoever which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government which so

**Additional Clauses to "M.V. Ever Reliance or Sub"**

**Account: "LAlumina LLC, Sorrento, Louisiana (USA)"**

**Charter Party Dated: "26ᵗʰ July 2019"**

requires, or any body or group acting with the power to compel compliance with their orders or directions;

(ii)    To comply with the orders, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

(iii)   To comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

(iv)   To discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;

(v)    To call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions;

(vi)   Where cargo has not been loaded or has been discharged by the Owners under any provisions of this Clause, to load other cargo for the Owners' own benefit and carry it to any other port or ports whatsoever, whether backwards or forwards or in a contrary direction to the ordinary or customary route.

(g)    If in compliance with any of the provisions of sub-clauses (b) to (f) of this Clause anything is done or not done, such shall not be deemed to be a deviation, but shall be considered as due fulfilment of the Contract of Carriage.

**BIMCO ISPS / MTSA Clause for Voyage Charter Parties**

(a) (i)   The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and "the Company" (as defined by the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).

(ii)   Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) and the full style contact details of the Company Security Officer (CSO).

**Additional Clauses to "M.V. Ever Reliance or Sub"**
**Account: "LAlumina LLC, Sorrento, Louisiana (USA)"**
**Charter Party Dated: "26ᵗʰ July 2019"**

(iii)    Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company" / "Owner" to comply with the requirements of the ISPS Code / MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party.

(b) (i)    The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code / MTSA.

(ii)    Loss, damages or expense (excluding consequential loss, damages or expense) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party, and any delay caused by such failure shall count as laytime or time on demurrage.

(c)    Provided that the delay is not caused by the Owners' failure to comply with their obligations under the ISPS Code / MTSA, the following shall apply:

(i)    Notwithstanding anything to the contrary provided in this Charter Party, the Vessel shall be entitled to tender Notice of Readiness even if not cleared due to applicable security regulations or measures imposed by a port facility or any relevant authority under the ISPS Code / MTSA.

(ii)    Any delay resulting from measures imposed by a port facility or by any relevant authority under the ISPS Code / MTSA shall count as laytime or time on demurrage, unless such measures result solely from the negligence of the Owners, Master or crew or the previous trading of the Vessel, the nationality of the crew or the identity of the Owners' managers.

(d)    Notwithstanding anything to the contrary provided in this Charter Party, any costs or expenses whatsoever solely arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code / MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew or the previous trading of the Vessel, the nationality of the crew or the identity of the Owners' managers. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(e)    If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

Impala hereby grants User and such of its agents, representatives and invitees (collectively, "Agents") and each of its and their employees, all as designated in writing to Impala from time to time the right and privilege to access the Terminal. User shall be absolutely responsible and liable for its Agents and their actions, and for their compliance and/or non-compliance with this Agreement.   Such access shall be conditioned on the following requirements:

**1.5.1   Compliance with Rules, Laws and Regulations.** User, its Agents and each of its and their respective employees shall access the Terminal in a manner as to cause minimum interference with Impala's operations. User agrees to and to cause its Agents to (i) comply with all rules posted by Impala at the Terminal, (ii) comply with all federal, state and local laws, statutes, ordinances, rules, and regulations that may be applicable to User's and its Agents' activities at the Terminal, and (iii) obtain all permits and licenses required by law.

**1.5.2   Controlled Substance Abuse.** User shall have adopted policies and procedures to ensure a drug and alcohol free work place, and enforce its policy with appropriate drug and alcohol testing programs. All testing programs shall specify substances, testing frequency and threshold levels, which, at a minimum comply with the Department of Transportation drug testing regulations.

**1.5.3   Safety of Vehicles and Equipment.** User agrees that all vehicles and equipment owned, leased or otherwise under the control of User and its Agents will be properly maintained, and in a safe condition. User shall remove any equipment that in Impala's discretion poses a safety hazard at the Terminal. In the event User fails to remove such unsafe equipment, Impala has the right to remove such equipment with User paying or reimbursing Impala for the cost of such removal.

**1.5.4   Incident Reporting.** User must report all incidents (including accidents and near misses) that occur at the Terminal in writing to Impala within 24 hours following such incident. The report should describe the incident and include any investigative materials or documents that User completes, and any related documentation and reports submitted to any entity, including but not limited to, any governmental agency, User's insurer, or others.

**1.5.5   No Agency Relationship.** Neither User nor its Agents act under the direction, control or supervision of Impala and none of the foregoing is an agent of Impala.

## SECTION 2.  TERMINAL SPECIFICATIONS

### 2.1.   Terminal Location

The Terminal is located at Darrow, Louisiana, on the West Descending Bank of the Mississippi River. The Buoys are located at mile marker LMR 169.2. The Berth is located at mile marker LMR 169.5.

### 2.2.   Midstream Operations

Description of Buoys

5 buoys with a capacity of 150 metric tons each
The upstream buoy is located at a distance of approximately 1,235 feet from the downstream buoy.

Limitations

Maximum Length Overall: 230 meters / 755 feet

{N2933155 7}

Maximum Beam: 32.2 meters / 105.6 feet
Maximum Displacement: 85,600 metric tons
Maximum Air draft: 17 meters / 56 feet

Loading Rate

Loading Rate (per Weather Working Day) shall be per the terms of the Customer Contract

### 2.3.   Terminal Operations

Berth Description

Length of Berth: 335 meters / 1,100 contiguous feet
Length of Dock: 267 meters / 875 feet
Water Depth at Dock: 14 meters / 46 feet low water draft
Spout Reach from face of Dock: 40 meters / 131 feet

Ocean Vessel Limitations

Maximum Length Overall: 270 meters / 886 feet
Maximum Beam: 43 meters / 141 feet
Maximum Displacement: 169,500 metric tons (when fully loaded)
Maximum Air draft: 18.6 meters / 61 feet

Barge Unloading Limitations/Requirements

Maximum Width: 10.7 meters / 35 feet
Maximum Length: 62.5 meters / 205 feet

Loading Rate

Loading Rate (per Weather Working Day) shall be per the terms of the Customer Contract

### 2.4   Accuracy of Terminal Specifications

All descriptions and dimensions provided within this Section 2 are approximate, and Impala *makes no warranty or guarantee of the accuracy of this information*; provided, however, Impala guarantees the loading rates in Section 2.2 and Section 2.3 subject to the other terms hereof and any separate agreement between Vessel Party and Impala. The loading-rate guarantees in Section 2.2 and Section 2.3 will be adjusted if the Ocean Vessel has ship gear or other features that impede the normal loading capabilities of Impala. Guaranteed loading rates do not apply on Holidays.

## SECTION 3. VESSEL NOMINATIONS

### 3.1.   Nominations

**3.1.1   Ocean Vessel Nominations.** Ocean Vessel nominations shall be furnished to Impala by confirmed receipt e-mail to **BurnsideShips@ImpalaTerminals.com** not earlier than 30 days and not later than 15 days prior to the Ocean Vessel's projected ETA at the Terminal. Such nomination shall include the Ocean Vessel IMO number, tonnage, loading drafts, name of carrier, and type of Cargo carried or to be carried and

shall include the additional information below based on type of Vessel. Acceptance by Impala of a nomination of a Vessel or scheduling of Barges shall be evidenced by Impala's confirmation by e-mail transmittal to the relevant Vessel Party, and Impala must respond to such nomination with 24 hours.

**Ocean Vessel (> 60,000 metric tons):**

    a.   Vessel Party shall request from Impala, in writing, a 10-day Layday Period at least 30 days prior to the date of the first day of the Layday Period. Impala shall advise Vessel Party in writing within 24 hours whether or not the proposed Layday Period is acceptable. If the proposed Layday Period is not acceptable, Impala shall offer Vessel Party an alternative Layday Period for Vessel Party's consideration.

    b.   No later than 15 days from the date of the first day of the agreed-upon Layday Period, Vessel Party shall identify in writing to Impala a 5-day Laycan within such original Layday Period. In each case mentioned above, the written approval of Impala shall be required relative to the 10-day Layday Period and the 5-day Laycan.

**Ocean Vessel (< 60,000 metric tons):**

    a.   Vessel Party shall request from Impala, in writing, a 7-day Layday Period at least 30 days prior to the date of the first day of the Layday Period. Impala shall advise Vessel Party in writing within 24 hours whether or not the proposed Layday Period is acceptable. If the proposed Layday Period is not acceptable, Impala shall offer Vessel Party an alternative Layday Period for Vessel Party's consideration.

    b.   No later than 15 days from the date of the first day of the agreed-upon Layday Period, Vessel Party shall identify in writing to Impala a 4-day Laycan within such original Layday Period. In each case mentioned above, the written approval of Impala shall be required relative to the 7-day Layday Period and the 4-day Laycan.

    **3.1.2    Barge Requirements.** The Vessel Party shall provide the following information on each Barge not later than 7 days prior to the projected ETA of the Barge at the Terminal: the individual barge number, tonnage, loading drafts, name of carrier, projected ETA, a designation of whether the Cargo is to be delivered to the storage pad or held for direct transfer to Ocean Vessel, and the type of Cargo carried or to be carried, which report shall be subsequently updated on the Monday of each week until such Barges are received at the relevant fleet. All Users and their Barges utilizing the facilities and services of Impala shall be subject to and shall abide by the terms and conditions of these Rules.

**3.2.**    **Filing**

    All Ocean Vessels and Vessel Parties which intend to utilize the facilities and services of Impala shall file with Impala by confirmed receipt e-mail to BurnsideShips@ImpalaTerminals.com, a Berth Application stating the projected ETA of the Vessel. The Berth Application must be received by Impala no later than 15 days prior to the projected ETA of the Ocean Vessel. An executed original of the Berth Application must follow by U.S. Mail to the following address:

    Attn: Transportation Manager
    Impala Terminals Burnside LLC
    4258 Highway 44
    Darrow, Louisiana 70725

Acceptance by Impala of a Berth Application shall be evidenced by Impala's issuance to the Vessel Party of a

Berth Application acceptant notice ("Acceptance Notice") confirming the projected ETA as the scheduled ETA. The Vessel shall send to Impala by e-mail updated ETAs as follows: 10 days, 5 days, 48 hours, 24 hours, 12 hours, 6 hours prior to arrival.

### 3.3    Vessel Scheduling

Subject to Section 5.7, Impala will endeavor to berth Ocean Vessels in order of nomination acceptance, subject to (i) timely receipt of ETA updates, (ii) arrival within the agreed-upon Laycan, and (iii) compliance with the other terms hereof; provided, however, that Impala shall have the right to assign Vessels to the Berth or Buoys, in its sole discretion, for whatever reasons, in whatever order it determines, including subject to conditions at the Terminal including Terminal, port, or river closures, Terminal or port restrictions, Terminal or port congestion, or weather and river conditions and other conditions beyond Impala's reasonable control.

### 3.4.    Certification for Filing

In the case of an Ocean Vessel, the following certificates and documents must be presented to Impala to file for a berth at the Terminal:

    i.  An original Berth Application signed by the authorized Vessel Party.

    ii.  A copy of the NOR executed by the authorized Vessel Party.

    iii.  A customary hold cleanliness certificate.

    iv.  International tonnage certificate.

    v.  A proposed stowage plan which includes Cargo cubic capacity for any Ocean Vessel to be loaded and the loading sequence or the actual plan for Cargo to be unloaded including the unloading sequence.

    vi.  Should it be necessary for Vessel personnel to leave the Vessel or Visitors, including Vessel's agent, to board the Vessel, 24 hours prior written notification to Impala must be provided and include a list of the: (a) name, (b) address, (c) telephone number and (d) reason for visit. Each visitor to the Vessel and Vessel personnel leaving the Vessel must be on the a visitor list ("Visitor List"). Each Visitor must have a form of identification acceptable to Impala. The Visitor List shall be supplemented as needed and furnished in advance of the visit to Impala in writing between 7:30 a.m. and 4:00 p.m. Mondays through Fridays, excluding Holidays. Any Vessel personnel leaving the ship shall be required to furnish Impala with a Crewman's Landing Permit — Form 1-95 issued by the U.S. Immigration & Naturalization Service and a picture identification card.

    vii.  Any special loading or unloading instructions, including instructions regarding the specific location of structural or other protruding objects in the Vessel's cargo hold(s) that could be damaged during loading or unloading.

### 3.5.    Notice of Readiness

Once the Ocean Vessel to be loaded is (a) located at the Berth, the Buoys, or the closest available safe anchorage to Darrow, Louisiana, and (b) ready and suitable in all respects to commence loading, the master of the Ocean Vessel shall tender a NOR whether cleared at customs or not, whether in free pratique or not, whether in port or not, and whether in berth or not. Impala shall not be required to accept the NOR unless and until the NOR is tendered within the applicable Laycan.

{N2933155 7}

[Page 59 of 78] · [7.3.14] [14  Execution version - Amended and Restated Terminal Services Agreement dated 30 June 2015 pdf]

**3.6.    Laytime; Demurrage for Failing to Meet the Guaranteed Loading Rate; Despatch**

Laytime commences upon the earlier to occur of: (a) 12 hours after the Ocean Vessel has properly tendered a NOR, or (b) when a Vessel is secured All Fast and is ready to load in all respects, provided that time consumed for the following shall not count as Laytime (or time on demurrage):

i.    Time consumed by the Ocean Vessel in moving from port anchorage to the Berth, including waiting for tide, traffic, or daylight, and time consumed during draft surveys;

ii.   If loading starts before the completion of the 12-hour period after NOR ("turn time"), then only actual time used shall count as Laytime until expiration of such turn time;

iii.  Any delay due to inability of the Ocean Vessel's facilities to safely discharge or receive Cargo for any reason;

iv.   Any time consumed in interruption of transportation operations due to the Vessel's failure to comply with terminal regulations (including, but not limited to, these Rules);

v.    Delay due to prohibition of Cargo transfer at any time by the Vessel, the owner or operator of the Vessel, or by governmental authorities, unless such prohibition is caused by Impala's failure to comply with applicable laws;

vi.   Delays due to awaiting customs and/or immigration clearance and pratique, if applicable;

vii.  Any delay caused by strike, lockout, stoppage or restraint of labor of the Master, officers and crew of the Vessel or pilots or any delay for which a Vessel Party, the Vessel, her Master or crew is responsible; or

viii. Any delay caused by conditions not reasonably within Impala's control, including but not limited to, weather, equipment failure, awaiting tide, Force Majeure, blockage of channels caused by spills or accidents, etc.

Laytime ends when the Ocean Vessel has completed loading.

Subject to the foregoing, the amount of Laytime for a given Ocean Vessel equals the actual quantity of Cargo to be loaded onto the Ocean Vessel divided by the pro rata guaranteed load rate set forth in **Section 2.3**.

To the extent Impala exceeds the applicable amount of Laytime for an Ocean Vessel, Impala will reimburse Vessel Party for actual vessel demurrage incurred, invoiced, and paid in accordance with the demurrage rate as set forth in the charter party provided by Vessel Party to Impala prior to Ocean Vessel's arrival at the Terminal. Upon request from Impala, Vessel Party shall immediately supply Impala with a copy of the charter party. Notwithstanding the foregoing, the demurrage shall be reasonably in line with the daily hire rates for the Ocean Vessel at the time of entering the charter party. Vessel Party shall pay despatch compensation to Impala for time saved by exceeding the applicable guaranteed loading rate at an amount equal to 50% of the demurrage rate in the applicable charter party documents.

Notwithstanding anything to the contrary, Vessel Party waives any demurrage claim to which it may be entitled if Vessel Party does not provide notice to Impala on or before 60 calendar days after the date on which the applicable Ocean Vessel completes loading.

Annex C

to contract no. _____

Shipping terms at Sherbro River

**1.   Lay/can**
The 5 days lay/can load port, will be agreed in written by parties 30 calendar days before 1st day of the lay/can.

**2.   Vessel's description**
The maritime performing vessel will be a geared single-decker/bulk carrier of max 25 years old, fully suitable for grab loading and discharging.
Performing vessel has to have no centerline bulkhead, no twin hatches, no cargo battens and no obstruction in holds and on deck which could hinder grab and/or any loading, discharging operation. The vessel has to be equipped with mechanically operated hatch covers in good conditions. Vessel's tropical DWT may go up to 63000 mt. The cargo intake at Sherbro River has to be declared up on vessel's nomination and reconfirmed in NOR, basis of maximum allowed sailing draft of 12.5 meters fresh water.
The holds of the vessel have to be clean and dry ready to store bauxite in bulk. The holds will be inspected by Seller's representative and Chief Officer of the vessel. Seller will not be responsible for any contamination of Bauxite inside vessel's holds.
The vessel has to be geared with in min. 4 cranes and fitted with min. 4 grabs and ready in all respects to perform self loading of cargo at min 7000 mt pwwd sshinc.

**3.   Stevedores**
The stevedoring to be arranged by the Buyer and to be on Buyer's account.

**4.   Vessel's nomination**
The performing vessel has to be nominated latest 10 days before 1st day of lay/can. Seller has to reconfirm or refuse nominated vessel to the Seller within max 12 office hrs from nomination. Refusal of the vessel cannot be unreasonably made. The Buyer has to replace the vessel with a vessel complying with above description latest 3 days before 1st day of the lay/can.

If the Seller rejects a vessel it shall serve by e-mail or facsimile a rejection notice on the Buyer setting out the grounds for the rejection (the "Rejection Notice").  For the avoidance of doubt, service of a Rejection Notice shall not constitute a breach of this Contract.

If the Buyer fails to nominate a substitute vessel which is compliant, the Seller shall be entitled, in its sole discretion, to (a) cancel the shipment, and/or (b) terminate the Contract. The Buyer shall, provided it has acted negligently, indemnify the Seller against any and all costs, expenses, direct losses and liabilities incurred as a result of the Seller exercising its rights under this Clause 4.

**5.   Vessel's delay out of agreed lay/can**
If the performing vessel delays arrival at loading port out of agreed lay/can the Buyer may ask for an extension of canceling. The Seller will grant the extension, if any, in 12 working hours from request. If the extension is not granted the loading of the vessel will be done on unprivileged basis.

**6.   Notices and Notice of Readiness (NOR)**
NOR will be accepted 12 hrs after vessel dropped anchor at Sherbro River Buoy 4 subject will be found ready in all respects to load bauxite in bulk. If the vessel will not be ready NOR will be rejected. And a new NOR has to be tendered once vessel became ready again.

**7.    Loading rate**

The cargo will be delivered alongside the ship to guarantee a minimum loading rate of 7000 tones pwwd sshinc . Excepted days are 2 days Christmas; 2 days New Year; 2 days Easter; National Day of Sierra Leone and national election dates established by the Government of Sierra Leone.

**8.    Lay/time**

Lay/time starts counting in 12 hrs since NOR is accepted, unless used if used to count. Lay/time finish when loading is complete. Statement of Lay/time counting to be made based on official vessel's Statement of Facts (SOF) in max 15 days after BL issuing.

**9.    Agents at Port of Loading**

OBT Shipping 2 Blackhall Road, Freetown, Sierra Leone. Tel. +232 76 692 692   ; +232 30 777 006; +232 76 696 44; Fax. +45 32 727 612 e-mail: fda@obts.dk; chr@obts.dk; alm@obts.dk; silops@obts.dk

**10.  Taxes**

Any tax on cargo to be on Seller's account and any tax on ship to be on Buyer's account. Seller to have free use of light on board of the performing vessel.

**11.  Overtime**

The overtime to be for the account of the party ordering same. Should the Port Authority order overtime it should be on Buyer's account.

**12.  Port restrictions**

Seller guarantees 1 safe anchorage at Sherbro River Buoy 4. Vessel owners have to be fully aware of place of loading calling Sherbro River Buoy 4 for bauxite loading. The loading is actually done at anchorage and the only restriction is maximum allowed departure draft of 12.5 m fresh water.

**13.  Demurrage/ Dispatch**

Demurrage rate will be according relevant charter party. Dispatch rate, if any, will be always half of demurrage rate.

March 2014

Exhibit B

| | |
|---|---|
| **From:** | Tom Crampton [TC@murship.com] |
| **Sent:** | Tuesday, September 08, 2020 1:53 AM |
| **To:** | chartering@danbro.dk; Heinrich (hh@danbro.dk) |
| **Cc:** | Anne Askov |
| **Subject:** | RE: MUR/LaLumina COA - LaLumina default |
| **Attachments:** | MUR/LaLumina COA - LaLumina default |

Please pass to Charterers LaLumina and confirm having done so.

Dear Sirs

You have not responded to the messages of 21 August from Owners or Owners' lawyers.  Nor have Charterers said anything at all about the COA or the further shipments remaining.  It seems clear therefore that Charterers will not be performing the COA which Owners now terminate for Charterers' repudiatory breaches.

For the sake of good order, we attach again details of Owners' losses from Charterers' non-performance.

Best regards

Tom Crampton
MUR Shipping Dubai
+971 50 652 4151

---

**From:** Tom Crampton
**Sent:** 21 August 2020 12:24 PM
**To:** chartering@danbro.dk; Heinrich (hh@danbro.dk) <hh@danbro.dk>
**Cc:** Anne Askov <aav@murship.com>
**Subject:** MUR/LaLumina COA - LaLumina default

Dear Sirs

Please pass to Charterers LaLumina and confirm having done so.

Best regards

Tom Crampton
MUR Shipping Dubai
+971 50 652 4151

1



Dear Sirs

**MUR/LaLumina**

Under the MUR/LaLumina COA LaLumina were to ship 12-14 shipments during 2020, evenly spread with a maximum of two months with two shipments in.  To date, the following shipments have been made:

| Laycan | Performing vessel |
| --- | --- |
| 5-9 Jan | Searider |
| 19-23 Feb | Sealuck II |
| 15-19 Mar | Sofie Victory |
| 8-12 May | Orient Trader |
| 18-22 May | Nautical Georgia |

No shipments were made in June or July and no shipment has been nominated for August (and Charterers are past the time when any such nomination should have been made).  There is no indication of any shipment being made in September, or for the balance of the year.  It seems that LaLumina have no intention of performing their obligations under the COA, although if we are wrong on that we ask LaLumina to immediately nominate a shipment for September.  If no nomination is received within 7 days we will hold LaLumina in repudiatory breach of the COA and terminate the contract.

LaLumina's default has caused MUR a considerable loss.  We attach calculations for our losses for June, July and August based on vessels available in the area as follows:

| Month | Example performing vessel | Estimated profit |
| --- | --- | --- |
| June | Golden Suek | USD229,891.33 |
| July | Wu Gui Shan | USD191,910.70 |
| August | Amis Orchid | USD232,504.25 |
| | **Sub-total:** | **USD654,306.28** |

For the balance of the year we have calculated the voyages on the basis of the current BSI figures for the reduced by 12% (the historical difference between BSI average and route BSI9) and a further reduction of USD3,300 to reflect the differential of the route BSI9 Cont-Med versus USG positioning value of the voyage,

MUR Shipping B.V.
Suite 226, Building 4, Gold & Diamond Park, Dubai | PO Box 262206, Jebel Ali, United Arab Emirates
T +971 4 341 5701 F +971 4 341 5904 E ops.ae@murship.com | chart.ae@murship.com
Dubai Branch No. 80045

**www.murship.com**



and we attach calculations for September, October, November, December accordingly, showing the following results.

| Month | Adjusted BSI | Estimated profit |
|---|---|---|
| September | USD3,960 | USD205,819.00 |
| October | USD4,356 | USD200,729.00 |
| November | USD4,070 | USD216,224.84 |
| December | USD4,070 | USD216,224.84 |

|  |  |
|---|---|
| **Sub-total** | **USD838,997.68** |
| **Grand total** | **USD1,493,306.96** |

The total losses for the year to date amount to USD654,306.28. Please pay these within 7 days of today's date and resume nominations for September, failing which we will terminate the COA and claim the full losses set out above, plus interest and costs.

Best regards

**MUR SHIPPING BV**

**Voyage Charter Calculation**
MUR Shipping BV

20. August 2020
Page   1
AAV

No.. . . . . . . . . . . CH15387
Vessel. . . . . . . . . African Blue Crane
Daily expenses . . . . . 6,468.00
Charterers. . . . . . . . Lalumina LLC
Employment . . . . . . 55k Bauxite Sherbro River
13m/Burnside - Sep 2020

Created   10/08/20  10:11   AAV

| Consumption: | Restriction | Speed | Bunker Type | Consumption Ballast | Consumption Laden |
|---|---|---|---|---|---|
| at sea used | DEFAULT | 14.00 | IFO | 0.00 | 30.60 |
| at sea used | DEFAULT | 14.00 | MGO | 0.00 | 0.10 |
| at sea used | DEFAULT | 14.50 | IFO | 30.00 | 0.00 |
| at sea used | DEFAULT | 14.50 | MGO | 0.10 | 0.00 |
| In port used | 0.1% ALL GR | | MGO | 2.10 | 4.50 |
| In port used | DEFAULT | | IFO | 2.00 | 4.40 |

| Bunker Code | Replenishment price |
|---|---|
| HSIFO | 450.00 |
| HSMGO | 450.00 |
| LSIFO | 388.00 |
| LSMGO | 450.00 |

| Cargo No. | Commodity Name | Freight Quantity | Freight rate (LCY) | Unit | Commissions | Loading rate | Unit | Discharge rate | Unit | Stevedoring Loading | Unit | Stevedoring Discharge | Unit |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | BAUXITE | 54,000.00 | 17.25 | Mt | 3.75 | 7,000.00 | Met | 18,000.00 | Met | 0.00 | Mt | 0.00 | Mt |

| Port | Port Code | B L | Distance | Speed | Days at sea | Extra days | Cargo No | L D | Quantity | I W | SHINC SHEX | Days in port | Extra days | Port expenses | Stevedoring |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DAKAR | BA | Ba | 0 | 14.50 | | | | | | Idl | 1 | | | 0.00 | 0.00 |
| SHERBRO RIVER | LP | La | 597 | 14.50 | 1.71 | | 1 | L | 54,000.00 | Idl | 1 | 7.71 | 0.50 | 55,000.00 | 0.00 |
| BURNSIDE | DP | La | 4,833 | 14.00 | 14.39 | 0.50 | 1 | D | 54,000.00 | Idl | 1 | 3.00 | 0.50 | 240,000.00 | 0.00 |

| Days at sea/port/total incl. extra days | 16.60 | 11.71 | 28.31 | Total | 54,000.00 | Mts. |
|---|---|---|---|---|---|---|

| | | | | | | | T/C equivalent. . . . . | 13,737.01 |
|---|---|---|---|---|---|---|---|---|
| Other income . . . . . | 0.00 | Gross freight . . . . . | 931,500.00 | Port expenses. . . . . | 295,000.00 | APS/DOP T/C Equival | 15,337.27 |
| Ballast bonus OUT . . | 0.00 | Fixed expenses . . . . | 0.00 | Stevedore expenses . | 0.00 | Break even. . . . . . . | 13.29 |
| Despatch . . . . . . . | 0.00 | Net freight. . . . . . . | 896,568.75 | Bunker costs . . . . . | 202,611.03 | Daily result . . . . . . | 7,269.01 |
| Miscellaneous. . . . . | 10,000.00 | Running costs. . . . . | 183,138.73 | Voyage result . . . . . | 205,819.00 | US$ 1.00 impact. . . . | 1,835.63 |

**Voyage Charter Calculation**
MUR Shipping BV

20. August 2020
Page   1
AAV

No. . . . . . . . . . . . CH15387
Vessel. . . . . . . . . African Blue Crane
Daily expenses . . . . . 6,600.00
Charterers. . . . . . . . Lalumina LLC
Employment . . . . . . 55k Bauxite Sherbro River
13m/Burnside - Oct 2020

Created   10/08/20 10:11   AAV

| Consumption: | Restriction | Speed | Bunker Type | Consumption Ballast | Consumption Laden |
|---|---|---|---|---|---|
| at sea used | DEFAULT | 14.00 | IFO | 0.00 | 30.60 |
| at sea used | DEFAULT | 14.00 | MGO | 0.00 | 0.10 |
| at sea used | DEFAULT | 14.50 | IFO | 30.00 | 0.00 |
| at sea used | DEFAULT | 14.50 | MGO | 0.10 | 0.00 |
| In port used | 0.1% ALL GR | | MGO | 2.10 | 4.50 |
| In port used | DEFAULT | | IFO | 2.00 | 4.40 |

| Bunker Code | Replenishment price |
|---|---|
| HSIFO | 450.00 |
| HSMGO | 450.00 |
| LSIFO | 371.00 |
| LSMGO | 450.00 |

| Cargo No. | Commodity Name | Freight Quantity | Freight rate (LCY) | Unit | Commissions | Loading rate | Unit | Discharge rate | Unit | Stevedoring Loading | Unit | Stevedoring Discharge | Unit |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | BAUXITE | 54,000.00 | 17.25 | Mt | 3.75 | 7,000.00 | Met | 18,000.00 | Met | 0.00 | Mt | 0.00 | Mt |

| Port | Port Code | B L | Distance | Speed | Days at sea | Extra days | Cargo No | L D | Quantity | I W | SHINC SHEX | Days in port | Extra days | Port expenses | Stevedoring |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DAKAR | BA | Ba | 0 | 14.50 | | | | | | Idl | 1 | | | 0.00 | 0.00 |
| SHERBRO RIVER | LP | La | 597 | 14.50 | 1.71 | | 1 | L | 54,000.00 | Idl | 1 | 7.71 | 0.50 | 55,000.00 | 0.00 |
| BURNSIDE | DP | La | 4,833 | 14.00 | 14.39 | 0.50 | 1 | D | 54,000.00 | Idl | 1 | 3.00 | 0.50 | 240,000.00 | 0.00 |

Days at sea/port/total incl. extra days      16.60   11.71   28.31      Total   54,000.00 Mts.

| | | | | | |
|---|---|---|---|---|---|
| | | | | T/C equivalent. . . . . | 13,689.26 |
| Other income . . . . . | 0.00 | Gross freight . . . . . | 931,500.00 | Port expenses. . . . . | 295,000.00 | APS/DOP T/C Equival | 15,292.24 |
| Ballast bonus OUT . . | 0.00 | Fixed expenses . . . . | 0.00 | Stevedore expenses . | 0.00 | Break even. . . . . . . | 13.39 |
| Despatch . . . . . . . | 0.00 | Net freight. . . . . . . | 896,586.75 | Bunker costs . . . . . | 203,962.93 | Daily result . . . . . . | 7,089.26 |
| Miscellaneous. . . . . | 10,000.00 | Running costs. . . . . | 186,876.25 | Voyage result . . . . . | 200,729.57 | US$ 1.00 impact. . . . | 1,835.63 |

**Voyage Charter Calculation**                                                      20. August 2020
MUR Shipping BV                                                                        Page    1
                                                                                                AAV

No.. . . . . . . . . . . . CH15387                                    Created    10/08/20  10:11   AAV
Vessel. . . . . . . . . African Blue Crane
Daily expenses . . . . . 6,005.00
Charterers . . . . . . . Lalumina LLC
Employment . . . . . . 55k Bauxite Sherbro River
                        13m/Burnside - Nov 2020

| Consumption: | Restriction | Speed | Bunker Type | Consumption Ballast | Consumption Laden |
|---|---|---|---|---|---|
| at sea used | DEFAULT | 14.00 | IFO | 0.00 | 30.60 |
| at sea used | DEFAULT | 14.00 | MGO | 0.00 | 0.10 |
| at sea used | DEFAULT | 14.50 | IFO | 30.00 | 0.00 |
| at sea used | DEFAULT | 14.50 | MGO | 0.10 | 0.00 |
| In port used | 0.1% ALL GR | | MGO | 2.10 | 4.50 |
| In port used | DEFAULT | | IFO | 2.00 | 4.40 |

| Bunker Code | Replenishment price |
|---|---|
| HSIFO | 450.00 |
| HSMGO | 450.00 |
| LSIFO | 374.00 |
| LSMGO | 450.00 |

| Cargo No. | Commodity Name | Freight Quantity | Freight rate (LCY) | Unit | Commissions | Loading rate | Unit | Discharge rate | Unit | Stevedoring Loading | Unit | Stevedoring Discharge | Unit |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | BAUXITE | 54,000.00 | 17.25 | Mt | 3.75 | 7,000.00 | Met | 18,000.00 | Met | 0.00 | Mt | 0.00 | Mt |

| Port | Port Code | B L | Distance | Speed | Days at sea | Extra days | Cargo No | L D | Quantity | I W | SHINC SHEX | Days in port | Extra days | Port expenses | Stevedoring |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DAKAR | BA | Ba | 0 | 14.50 | | | | | | ldl | 1 | | | 0.00 | 0.00 |
| SHERBRO RIVER | LP | La | 597 | 14.50 | 1.71 | | 1 | L | 54,000.00 | ldl | 1 | 7.71 | 0.50 | 55,000.00 | 0.00 |
| BURNSIDE | DP | La | 4,833 | 14.00 | 14.39 | 0.50 | 1 | D | 54,000.00 | ldl | 1 | 3.00 | 0.50 | 240,000.00 | 0.00 |

**Days at sea/port/total incl. extra days**        16.60   11.71   28.31      Total    54,000.00  Mts.

|  |  |  |  |  |  |
|---|---|---|---|---|---|
| | | | | T/C equivalent. . . . . | 13,641.52 |
| Other income . . . . . | 0.00 | Gross freight . . . . . | 931,500.00 | Port expenses. . . . . | 295,000.00 | APS/DOP T/C Equival | 15,247.22 |
| Ballast bonus OUT . . | 0.00 | Fixed expenses . . . . | 0.00 | Stevedore expenses . | 0.00 | Break even. . . . . . . | 13.09 |
| Despatch . . . . . . . | 0.00 | Net freight. . . . . . . | 896,588.75 | Bunker costs . . . . . | 205,314.84 | Daily result . . . . . | 7,636.52 |
| Miscellaneous. . . . . | 10,000.00 | Running costs. . . . . | 170,029.07 | Voyage result . . . . . | 216,224.84 | US$ 1.00 impact. . . . | 1,835.63 |

**Voyage Charter Calculation**
MUR Shipping BV

20. August 2020
Page   1
AAV

No. . . . . . . . . . . . CH15387
Vessel. . . . . . . . . . African Blue Crane
Daily expenses . . . . . 6,005.00
Charterers. . . . . . . Lalumina LLC
Employment . . . . . . 55k Bauxite Sherbro River
13m/Burnside - Dec 2020

Created   10/08/20 10:11   AAV

| Consumption: | Restriction | Speed | Bunker Type | Consumption Ballast | Consumption Laden |
|---|---|---|---|---|---|
| at sea used | DEFAULT | 14.00 | IFO | 0.00 | 30.60 |
| at sea used | DEFAULT | 14.00 | MGO | 0.00 | 0.10 |
| at sea used | DEFAULT | 14.50 | IFO | 30.00 | 0.00 |
| at sea used | DEFAULT | 14.50 | MGO | 0.10 | 0.00 |
| In port used | 0.1% ALL GR | | MGO | 2.10 | 4.50 |
| In port used | DEFAULT | | IFO | 2.00 | 4.40 |

| Bunker Code | Replenishment price |
|---|---|
| HSIFO | 450.00 |
| HSMGO | 450.00 |
| LSIFO | 374.00 |
| LSMGO | 450.00 |

| Cargo No. | Commodity Name | Freight Quantity | Freight rate (LCY) | Unit | Commissions | Loading rate | Unit | Discharge rate | Unit | Stevedoring Loading | Unit | Stevedoring Discharge | Unit |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | BAUXITE | 54,000.00 | 17.25 | Mt | 3.75 | 7,000.00 | Met | 18,000.00 | Met | 0.00 | Mt | 0.00 | Mt |

| Port | Port Code | B L | Distance | Speed | Days at sea | Extra days | Cargo No | L D | Quantity | I W | SHINC SHEX | Days in port | Extra days | Port expenses | Stevedoring |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DAKAR | BA | Ba | 0 | 14.50 | | | | | | Idl | 1 | | | 0.00 | 0.00 |
| SHERBRO RIVER | LP | La | 597 | 14.50 | 1.71 | | 1 | L | 54,000.00 | Idl | 1 | 7.71 | 0.50 | 55,000.00 | 0.00 |
| BURNSIDE | DP | La | 4,833 | 14.00 | 14.39 | 0.50 | 1 | D | 54,000.00 | Idl | 1 | 3.00 | 0.50 | 240,000.00 | 0.00 |

| Days at sea/port/total incl. extra days | 16.60 | 11.71 | 28.31 | Total | 54,000.00 Mts. |
|---|---|---|---|---|---|

| | | | | | | T/C equivalent. . . . . | 13,641.52 |
|---|---|---|---|---|---|---|---|
| Other income . . . . . | 0.00 | Gross freight . . . . . | 931,500.00 | Port expenses. . . . . | 295,000.00 | APS/DOP T/C Equival | 15,247.22 |
| Ballast bonus OUT . . | 0.00 | Fixed expenses . . . . | 0.00 | Stevedore expenses . | 0.00 | Break even. . . . . . . | 13.09 |
| Despatch . . . . . . . | 0.00 | Net freight. . . . . . . | 896,568.75 | Bunker costs . . . . . | 205,314.84 | Daily result . . . . . . | 7,636.52 |
| Miscellaneous. . . . . | 10,000.00 | Running costs. . . . . | 170,029.07 | Voyage result . . . . . | 216,224.84 | US$ 1.00 impact. . . . | 1,835.63 |

Voyage Charter Calculation
MUR Shipping BV

20. August 2020
Page    1
AAV
Created   20/08/20  14:33   AAV

No. . . . . . . . . . . . CH17943
Vessel. . . . . . . . . Golden Suek
Daily expenses . . . . 4,000.00
Charterers . . . . . . . Lalumine LLC
Employment . . . . . . 55k Bauxite - Sherbro River/ Burnside - Jun 20

| Consumption: | Restriction | Speed | Bunker Type | Consumption Ballast | Consumption Laden |
|---|---|---|---|---|---|
| at sea used | DEFAULT | 12.00 | IFO | 28.00 | 28.00 |
| in port used | DEFAULT | | IFO | 3.80 | 3.80 |

| Bunker Code | Replenishment price |
|---|---|
| HSIFO | 307.00 |
| HSMGO | 350.00 |
| LSIFO | 307.00 |
| LSMDO | 350.00 |
| LSMGO | 350.00 |

| Cargo No. | Commodity Name | Freight Quantity | Freight rate (LCY) | Unit | Commissions | Loading rate | Unit | Discharge rate | Unit | Stevedoring Loading | Unit | Stevedoring Discharge | Unit |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | BAUXITE | 60,500.00 | 16.00 | Mt | 2.50 | 18,000.00 | Met | 13,000.00 | Met | 0.00 | Mt | 0.00 | Mt |

| Port | Port Code | B L | Distance | Speed | Days at sea | Extra days | Cargo No | L D | Quantity | I W | SHINC SHEX | Days in port | Extra days | Port expenses | Stevedoring |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| GIBRALTAR | BA | Ba | 0 | 12.00 | | | | | | ld | 1 | | | 0.00 | 0.00 |
| SHERBRO RIVER | LP | La | 2,090 | 12.00 | 7.26 | | 1 | L | 60,500.00 | ld | 1 | 3.76 | 0.50 | 65,000.00 | 0.00 |
| BURNSIDE | DP | La | 4,833 | 12.00 | 16.78 | 1.00 | 1 | D | 60,500.00 | ld | 1 | 4.65 | 0.50 | 275,000.00 | 0.00 |

| Days at sea/port/total incl. extra days | | 25.04 | 9.44 | 34.48 | Total | 60,500.00 Mts. | |
|---|---|---|---|---|---|---|---|

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | T/C equivalent. . . . . | 18,995.66 |
| Other income . . . . . | 0.00 | Gross freight . . . . . | 968,000.00 | Port expenses . . . . . | 340,000.00 | APS/DOP T/C Equival | 15,841.64 |
| Ballast bonus OUT . . | 0.00 | Fixed expenses . . . . | 0.00 | Stevedore expenses . . | 0.00 | Break even . . . . . . . | 12.10 |
| Despatch . . . . . . . | 0.00 | Net freight. . . . . . . | 943,800.00 | Bunker costs . . . . . | 226,003.12 | Daily result . . . . . . | 6,668.08 |
| Miscellaneous. . . . . | 10,000.00 | Running costs. . . . . | 137,905.55 | Voyage result . . . . . | 229,891.33 | US$ 1.00 impact. . . . | 1,710.95 |

**Anne Askov**

| From: | Ida Ryberg |
|---|---|
| Sent: | Monday, 15 June 2020 08.34 |
| To: | MUR Global Chartering; MUR Global Operations |
| Cc: | MUR Bunkers; Kalpesh Ashok Sawant; Paulina Chahine; Rahul Kapoor; pnj2503 @gmail.com; Robert Muirhead |
| Subject: | Bunker Prices 15. June: VLSFO / LSMGO: Asia -5, EUR+US +5 |

| BRENT | 37.36 | | | | |
|---|---|---|---|---|---|
| Movement % | -3.54% | | | | |
| CP contract price | VLSFO | LS MGO | REMARKS | HSFO | VL-HS Spread |
| SINGAPORE | 300 | 335 | Barging 1500-3000 lps | 240 | 60 |
| HONG KONG | 305 | 335 | | | |
| SHANGHAI/ZHOUSHAN | 300 | 390 | | 280 | 20 |
| BUSAN | 305 | 355 | premium for prompt supplies | | |
| TOKYO | 310 | 490 | | | |
| NAKHODKA | 300 | 390 | LSMGO tight | | |
| FUJAIRAH | 295 | 380 | | 230 | 65 |
| KAOHSIUNG (TAIWAN) | 330 | NA | | | |
| DURBAN CONT. / SPOT | 350/380 | 490 | TIGHT AVAILS | | |
| R.BAY CONT. / SPOT | 350/385 | 490 | TIGHT AVAILS | | |
| CAPE TOWN | 395 | 500 | | | |
| PORT ELIZ. | 390 | 540 | | | |
| PORT LOUIS | 390 | 580 | | | |
| COLOM+TRINCO/COCHIN | 375/325 | 470/440 | premium for prompt supplies | | |
| RTM | 270 | 325 | | 225 | 45 |
| SKAW | 280 | 335 | | 240 | 40 |
| LAS PALMAS | 295 | 360 | premium for prompt supplies | | |
| ISTANBUL | 305 | 355 | Barge: 1500 - 2000 | | |
| MALTA | 285 | 345 | | | |
| NOVO+TUAPSE | 260 | 345 | | | |
| GIB | 290 | 355 | premium for prompt supplies | 245 | 45 |
| NOLA - EX.Wharf | 285 | 340 | Barging fee below | 240 | 45 |
| PORTLAND (OR) | 330 | 365 | Barging $8850 | | |
| PANAMA - EX.Wharf | 310 | 360 | BARGING +20 PR MTS | 270 | 40 |
| VANCOUVER - EX.Wharf | 310 | 375 | BARGING 9000$LPSM | | |
| LOS ANG /LONG BEACH | 310 | 365 | CALI TAX TO APPLY | | |
| KINGSTON, JM | 320 | 405 | | | |
| RIO GR / PARANAGUA | 314 | N/A | AVAILS REPORTED OK | | |
| RIO D.JAN/SANTOS | 289/284 | N/A | AVAILS REPORTED OK | | |
| VILA DO CONDE | 343 | N/A | AVAILS REPORTED OK | | |
| VITORIA | 309 | N/A | AVAILS REPORTED OK | | |
| ZONA COMUN | 350 | 490 | min. 200 ts | | |
| VALPARASIO | 350 | 560 | | | |
| CALLAO | 355 | 480 | Barging $6000 lps (less than 400ts) | | |

Voyage Charter Calculation
MUR Shipping BV

20. August 2020
Page     1
AAV

Created   20/08/20  14:32   AAV

No. . . . . . . . . . . . CH17942
Vessel. . . . . . . . . . Wu Gui Shan
Daily expenses . . . . . 7,000.00
Charterers. . . . . . . . Lalumina LLC
Employment . . . . . . . 55k Bauxite Sherbro River
13m/Burnside –Jul 2020

| Consumption: | Restriction | Speed | Bunker Type | Consumption Ballast | Consumption Laden |
|---|---|---|---|---|---|
| at sea used | DEFAULT | 13.80 | IFO | 0.00 | 34.50 |
| at sea used | DEFAULT | 14.50 | IFO | 34.20 | 0.00 |
| in port used | DEFAULT | | IFO | 3.50 | 5.50 |

| Bunker Code | Replenishment price |
|---|---|
| HSIFO | 450.00 |
| HSMGO | 450.00 |
| LSIFO | 327.00 |
| LSMGO | 450.00 |

| Cargo No. | Commodity Name | Freight Quantity | Freight rate (LCY) | Unit | Commissions | Loading rate | Unit | Discharge rate | Unit | Stevedoring Loading | Unit | Stevedoring Discharge | Unit |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | BAUXITE | 55,250.00 | 17.25 | Mt | 3.75 | 7,000.00 | Met | 18,000.00 | Met | 0.00 | Mt | 0.00 | Mt |

| Port | Port Code | B L | Distance | Speed | Days at sea | Extra days | Cargo No | L D | Quantity | I W | SHINC SHEX | Days in port | Extra days | Port expenses | Stevedoring |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ABIDJAN | BA | Ba | 0 | 14.50 | | | | | | Idl | 1 | | | 0.00 | 0.00 |
| SHERBRO RIVER | LP | La | 673 | 14.50 | 1.93 | | 1 | L | 55,250.00 | Idl | 1 | 7.89 | 0.50 | 55,000.00 | 0.00 |
| BURNSIDE | DP | La | 4,833 | 13.80 | 14.59 | 0.51 | 1 | D | 55,250.00 | Idl | 1 | 3.07 | 0.50 | 240,000.00 | 0.00 |

Days at sea/port/total incl. extra days         17.03    11.96   29.00      Total      55,250.00 Mts.

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | T/C equivalent. . . . . | 13,618.24 |
| Other income . . . . . | 0.00 | Gross freight . . . . . | 953,062.50 | Port expenses. . . . . | 295,000.00 | APS/DOP T/C Equival | 15,390.61 |
| Ballast bonus OUT . . | 0.00 | Fixed expenses . . . . | 0.00 | Stevedore expenses . | 0.00 | Break even . . . . . . | 13.64 |
| Despatch . . . . . . . | 0.00 | Net freight . . . . . . . | 917,322.66 | Bunker costs . . . . . | 217,431.40 | Daily result . . . . . . | 6,618.24 |
| Miscellaneous. . . . . | 10,000.00 | Running costs. . . . . | 202,980.56 | Voyage result . . . . . | 191,910.70 | US$ 1.00 impact. . . . | 1,833.90 |

**Anne Askov**

| | |
|---|---|
| **From:** | Ida Ryberg |
| **Sent:** | Wednesday, 15 July 2020 08.19 |
| **To:** | MUR Global Chartering; MUR Global Operations |
| **Cc:** | MUR Bunkers; Kalpesh Ashok Sawant; Paulina Chahine; Rahul Kapoor; pnj2503 @gmail.com; Robert Muirhead |
| **Subject:** | Bunker Prices 15. July: VLSFO / LSMGO: Minor adjustments (+5) |

| BRENT | 43.05 | | | | |
|---|---|---|---|---|---|
| Movement % | +0.35% | | | | |
| Destination price | **VLSFO** | **LS MGO** | **REMARKS** | **HSFO** | **VL-HS Spread** |
| SINGAPORE | 335 | 380 | *Barging 1500-3000 lps* | 270 | 65 |
| HONG KONG | 345 | 380 | | 280 | 65 |
| SHANGHAI/ZHOUSHAN | 345 | 425 | | 295 | 50 |
| BUSAN | 360 | 425 | *premium for prompt supplies* | | |
| TOKYO | 355 | 570 | | | |
| NAKHODKA | 330 | 430 | *LSMGO tight* | | |
| FUJAIRAH | 330 | 440 | | 240 | 90 |
| KAOHSIUNG (TAIWAN) | 352 | NA | | | |
| DURBAN CONT. / SPOT | 385/365 | 480 | | | |
| R.BAY CONT. / SPOT | 385/375 | 480 | | | |
| CAPE TOWN | 410 | 520 | | | |
| PORT ELIZ. | 385 | 520 | | | |
| PORT LOUIS | 380 | 500 | | | |
| COLOM+TRINCO/COCHIN | 380/360 | 490 | | | |
| RTM | 305 | 355 | | 245 | 60 |
| SKAW | 310 | 370 | | 255 | 55 |
| LAS PALMAS | 325 | 385 | *premium for prompt supplies* | | |
| ISTANBUL | 340 | 400 | Barge: 1500 - 2000 | | |
| MALTA | 320 | 380 | | | |
| NOVO+TUAPSE | 305 | 380 | | | |
| GIB | 320 | 385 | *premium for prompt supplies* | 280 | 40 |
| NOLA - EX.Wharf | 305 | 370 | Barging fee below | 270 | 35 |
| PORTLAND (OR) | 340 | 415 | Barging $8850 | | |
| PANAMA - EX.Wharf | 320 | 390 | BARGING +20 PR MTS | 290 | 30 |
| VANCOUVER - EX.Wharf | 335 | 400 | BARGING 9000$LPSM | | |
| LOS ANG /LONG BEACH | 345 | 410 | CALI TAX TO APPLY | | |
| KINGSTON, JM | 370 | 455 | | | |
| RIO GR / PARANAGUA | 339 | N/A | AVAILS REPORTED OK | | |
| RIO D.JAN/SANTOS | 314/309 | N/A | AVAILS REPORTED OK | | |
| VILA DO CONDE | 368 | N/A | AVAILS REPORTED OK | | |
| VITORIA | 334 | N/A | AVAILS REPORTED OK | | |
| ZONA COMUN | 360 | 500 | min. 200 ts | | |
| VALPARASIO | 410 | 520 | | | |
| CALLAO | 380 | 520 | Barging $6000 lps (less than 400ts) | | |

**Voyage Charter Calculation**

MUR Shipping BV

20. August 2020
Page     1
AAV

No. . . . . . . . . . . . CH17937
Vessel. . . . . . . . . . African Sanderling   *(Amis Orchid)*
Daily expenses . . . . . 6,800.00
Charterers . . . . . . . Lalumina LLC
Employment . . . . . . 55k Bauxite Sherbro River
                        13m/Burnside - Aug 2020

Created   20/08/20   14:26   AAV

| Consumption: | Restriction | Speed | Bunker Type | Consumption Ballast | Consumption Laden |
|---|---|---|---|---|---|
| at sea used | DEFAULT | 13.50 | IFO | 25.00 | 32.00 |
| at sea used | DEFAULT | 13.50 | MGO | 0.10 | 0.10 |
| at sea used | DEFAULT | 14.40 | IFO | 31.50 | 0.00 |
| at sea used | DEFAULT | 14.40 | MGO | 0.10 | 0.00 |
| in port used | DEFAULT | | IFO | 2.20 | 4.60 |
| in port used | DEFAULT | | MGO | 0.10 | 0.10 |

| Bunker Code | Replenishment price |
|---|---|
| HSIFO | 450.00 |
| HSMGO | 450.00 |
| LSIFO | 344.00 |
| LSMGO | 450.00 |

| Cargo No. | Commodity Name | Freight Quantity | Freight rate (LCY) | Unit | Commissions | Loading rate | Unit | Discharge rate | Unit | Stevedoring Loading | Unit | Stevedoring Discharge | Unit |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | BAUXITE | 57,000.00 | 17.25 | Mt | 3.75 | 7,000.00 | Met | 18,000.00 | Met | 0.00 | Mt | 0.00 | Mt |

| Port | Port Code | B L | Distance | Speed | Days at sea | Extra days | Cargo No | L D | Quantity | I W | SHINC SHEX | Days in port | Extra days | Port expenses | Stevedoring |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DAKAR | BA | Ba | 0 | 14.40 | | | | | | ldl | 1 | | | 0.00 | 0.00 |
| SHERBRO RIVER | LP | La | 597 | 14.40 | 1.73 | | 1 | L | 57,000.00 | ldl | 1 | 8.14 | 0.50 | 55,000.00 | 0.00 |
| BURNSIDE | DP | La | 4,633 | 13.50 | 14.92 | 0.52 | 1 | D | 57,000.00 | ldl | 1 | 3.17 | 0.50 | 240,000.00 | 0.00 |

Days at sea/port/total incl. extra days    17.16    12.31    29.47    Total    57,000.00 Mts.

|  |  |  |  | T/C equivalent. . . . . | 14,688.74 |
|---|---|---|---|---|---|
| Other income . . . . . | 0.00 | Gross freight . . . . . | 983,250.00 | Port expenses. . . . . | 295,000.00 | APS/DOP T/C Equival | 16,280.03 |
| Ballast bonus OUT . . | 0.00 | Fixed expenses . . . . | 0.00 | Stevedore expenses . | 0.00 | Break even. . . . . . . | 13.01 |
| Despatch . . . . . . . | 0.00 | Net freight. . . . . . . | 946,378.13 | Bunker costs . . . . . | 208,458.05 | Daily result . . . . . . | 7,888.74 |
| Miscellaneous. . . . . | 10,000.00 | Running costs. . . . . | 200,415.83 | Voyage result . . . . . | 232,504.25 | US$ 1.00 Impact. . . . | 1,861.45 |

**Anne Askov**

| | |
|---|---|
| **From:** | Ida Ryberg |
| **Sent:** | Thursday, 13 August 2020 08.14 |
| **To:** | MUR Global Chartering; MUR Global Operations |
| **Cc:** | MUR Bunkers; Kalpesh Ashok Sawant; Paulina Chahine; Rahul Kapoor; pnj2503 @gmail.com; Robert Muirhead |
| **Subject:** | Bunker Prices 13. August: VLSFO / LSMGO: +5 |

| BRENT | 45.3 |
|---|---|
| Movement % | -0.29% |

| CP= contract price | VLSFO | LS MGO | REMARKS | HSFO | VL-HS Spread |
|---|---|---|---|---|---|
| SINGAPORE | 355 | 395 | *Tight for 7-10 days* | 280 | 75 |
| HONG KONG / HUANGPU | 350/370 | 380/435 | *NO BUNKERING IN HK* | | |
| SHANGHAI/ZHOUSHAN | 355 | 435 | | 300 | 55 |
| BUSAN | 365 | 430 | *Tight for 7-10 days* | | |
| TOKYO | 375 | 580 | *Tight for 2 weeks* | | |
| NAKHODKA | 350 | 440 | *LSMGO tight* | | |
| FUJAIRAH | 335 | 460 | | 265 | 70 |
| KAOHSIUNG (TAIWAN) | 379 | NA | | | |
| DURBAN CONT. / SPOT | 400/380 | 490 | | | |
| R.BAY CONT. / SPOT | 400/390 | 490 | | | |
| CAPE TOWN | 420 | 530 | | | |
| PORT ELIZ. | 395 | 550 | | | |
| PORT LOUIS | 385 | 500 | | | |
| COLOM+TRINCO/COCHIN | 390/365 | 480/520 | | | |
| RTM | 315 | 370 | | 270 | 45 |
| SKAW | 320 | 380 | | 280 | 40 |
| LAS PALMAS | 330 | 395 | *premium for prompt supplies* | | |
| ISTANBUL | 350 | 425 | **Barge: 1500 - 2000** | | |
| MALTA | 330 | 390 | | | |
| NOVO+TUAPSE | 320 | 420 | | | |
| GIB | 330 | 395 | *premium for prompt supplies* | 295 | 35 |
| NOLA - EX.Wharf | 320 | 385 | **Barging fee below** | 280 | 40 |
| PORTLAND (OR) | 340 | 415 | **Barging $8850** | | |
| PANAMA - EX.Wharf | 330 | 395 | **BARGING +20 PR MTS** | 300 | 30 |
| VANCOUVER – EX.Wharf | 335 | 400 | **BARGING 9000$LPSM** | | |
| LOS ANG /LONG BEACH | 370 | 410 | **CALI TAX TO APPLY** | | |
| KINGSTON, JM | 385 | 475 | | | |
| RIO GR / PARANAGUA | 369 | N/A | **AVAILS REPORTED OK** | | |
| RIO DJAN/SANTOS | 344/339 | N/A | **AVAILS REPORTED OK** | | |
| VILA DO CONDE | 398 | N/A | **AVAILS REPORTED OK** | | |
| VITORIA | 364 | N/A | **AVAILS REPORTED OK** | | |
| ZONA COMUN | 385 | 520 | min. 200 ts | | |
| VALPARASIO | 410 | 560 | | | |
| CALLAO | 390 | 520 | Barging $6000 lps (less than 400ts) | | |

Exhibit C



# SECRETARY OF STATE

(https://www.sos.la.gov/Pages/default.aspx)
### Search for Louisiana Business Filings

[ Buy Certificates and Certified Copies ] [ Subscribe to Electronic Notification ] [ Print Detailed Record ]

| Name | Type | City | Status |
|---|---|---|---|
| LALUMINA LLC | Limited Liability Company (Non-Louisiana) | WILMINGTON | Active |

**Previous Names**
  ALMATIS BURNSIDE, LLC (Changed: 7/9/2019)
  ALMATIS BURNSIDE, INC. (Changed: 8/8/2016)

**Business:**        LALUMINA LLC
**Charter Number:**      41369802Q
**Registration Date:**     12/16/2013

**Domicile Address**
        251 LITTLE FALLS DRIVE
        WILMINGTON, DE 19808

**Mailing Address**
        ALMATIS INC.
        4701 ALCOA ROAD
        BENTON, AR 72015

**Principal Business Office**
        ALMATIS INC.
        4701 ALCOA ROAD
        BENTON, AR 72015

**Registered Office in Louisiana**
        501 LOUISIANA AVENUE
        BATON ROUGE, LA 70802

**Principal Business Establishment in Louisiana**
        501 LOUISIANA AVENUE
        BATON ROUGE, LA 70802

**Status**
**Status:**          **Active**
**Annual Report Status:**   **In Good Standing**
**Qualified:**         12/16/2013
**Last Report Filed:**     11/19/2020
**Type:**            Limited Liability Company (Non-Louisiana)

**Registered Agent(s)**

| Agent: | CORPORATION SERVICE COMPANY |
|---|---|
| Address 1: | 501 LOUISIANA AVENUE |
| City, State, Zip: | BATON ROUGE, LA 70802 |
| Appointment Date: | 11/27/2019 |

**Officer(s)**                                                    Additional Officers: No.

| | |
|---|---|
| **Officer:** | EMRE TIMURKAN |
| **Title:** | Manager |
| **Address 1:** | ALMATIS INC. |
| **Address 2:** | 4701 ALCOA ROAD |
| **City, State, Zip:** | BENTON, AR 72015 |

**Amendments on File (4)**

| Description | Date |
|---|---|
| Stmt of Chg or Chg Prin Bus Off | 12/28/2015 |
| Conversion | 8/8/2016 |
| Name Change | 8/8/2016 |
| Name Change | 7/9/2019 |

| Back to Search Results | New Search | View Shopping Cart |
|---|---|---|

GET HELP

© 2020 Louisiana Department of State

12/14/2020                                    Arkansas Secretary of State



**Notice: The SOS Business and Commercial Services office will be closing at 12:00 noon on December 30th and will reopen on January 4, 2021 at 8:30am to complete the transfer of franchise tax administration and collection to DFA per the Arkansas Tax Reform Act of 2019. Any company wanting to dissolve before the end of the year must do so prior to this time.**

Search Incorporations, Cooperatives, Banks and Insurance Companies

**All fields are not required.**

| | |
|---|---|
| Corporation Type | All Types |
| Enter Either **Name**<br>Suggestion: If you are searching for ABC Supplies, Inc., enter ABC Supplies. | LaLumina |
| OR **Fictitious Name** | |
| Registered Agent (RA) | |
| RA City | |
| RA State | Any State |
| Filing # | |

[ Search ]

Business Entity Certificates of Good Standing / Corporations Bulk Data Download / Business Entity Special Request List Builder

12/14/2020                                        Arkansas Secretary of State



**Notice: The SOS Business and Commercial Services office will be closing at 12:00 noon on December 30th and will reopen on January 4, 2021 at 8:30am to complete the transfer of franchise tax administration and collection to DFA per the Arkansas Tax Reform Act of 2019. Any company wanting to dissolve before the end of the year must do so prior to this time.**

Search Incorporations, Cooperatives, Banks and Insurance Companies

Printer Friendly Version

For service of process contact the Secretary of State's office.


There were no records found!


Back to Search

Exhibit D

Home (https://roskill.com/) / News (https://roskill.com/news/) / Bauxite and alumina: Almatis sells shares in US Burnside subsidiary

# Bauxite and alumina: Almatis sells shares in US Burnside subsidiary

Posted 15th July 2019 in Industry news (https://roskill.com/category/industry-news/).



On 27 June, Almatis (http://www.almatis.com/) reported the sale of 100% of its shares in Almatis Burnside to Arthur Metals. Almatis Burnside is an alumina manufacturer based in Louisiana, USA and will continue to supply Almatis, along with other customers, with premium-grade alumina. Almatis expects little change over the coming months in the relations of the two

companies. As well as supply to Almatis, the Burnside refinery supplies products directly to the specialty alumina and, sometimes, hydrate markets. The company is expected to change its name in due course following the acquisition.

## Roskill View

Almátis is a major producer of alumina products for use in the key markets of refractories, ceramics and polishing. It originally acquired the Burnside refinery facilities from Ormet Corporation in December 2013. At the time, the acquisition was seen as an important backwards integration for Almatis, providing the company with feedstock for its downstream alumina products manufacturing business. The Burnside refinery had 500ktpy of capacity at the time of this acquisition. Falling prices for bauxite and alumina through 2019, however, have made purchases of raw material from the market more attractive than having a captive supply.

The 10th edition of Roskill's Non-metallurgical Bauxite & Alumina: Outlook to 2029 report, with detailed analysis of the market, will be published in August 2019. Click here (https://roskill.com/market-report/non-metallurgical-bauxite-alumina/) to download the brochure and sample pages or to access further information.

## RELATED PRODUCTS

Metallurgical Bauxite & Alumina

## ROSKILL

**Head office**
54 Russell Road, Wimbledon, London, SW19 1QL, United Kingdom

**Regional offices**
Canada, China, Brazil, Germany,  Japan, New Zealand, Slovakia, South Africa, Spain

+44 20 8417 0087 (tel:+442084170087)

Contact Us (https://roskill.com/contact/)



 (https://www.linkedin.com/company/roskill-
information-
(https://twitter.com/Roskill_Info)

## ABOUT US

Contact (https://roskill.com/contact/)

About (https://roskill.com/about/)

The Team (https://roskill.com/about/the-team/)

The Board (https://roskill.com/about/the-board/)

Careers (https://roskill.com/careers/)

Consulting (https://roskill.com/consulting/)

Sustainability & Cost Analysis (https://roskill.com/sustainability-cost-analysis/)

News (https://roskill.com/news/)

Subscribe to our Weekly Round-up (https://roskill.com/newsletter/)

## MARKET REPORTS

Steel Alloys (https://roskill.com/division/steel-alloys/)

EV Raw Materials (https://roskill.com/division/ev-raw-materials/)

Copper & Technology Metals (https://roskill.com/division/copper-technology-metals/)

Industrial Minerals & Chemicals (https://roskill.com/division/industrial-minerals-chemicals/)

All Market Reports (https://roskill.com/market-reports/)

**EVENTS**

On the Road... London 2021 (https://roskill.com/event/on-the-road-london-2021/)

Copper and the EV Revolution (https://roskill.com/event/copper-and-the-ev-revolution/)

Technology Metals 2021 (https://roskill.com/event/technology-metals-2021/)

Salt 2021 (https://roskill.com/event/salt-2021/)

All events (https://roskill.com/events/)

Terms of Use (https://roskill.com/terms-of-use/)    Privacy Notice (https://roskill.com/privacy-notice/)

Event Terms & Conditions (https://roskill.com/event-terms-conditions/)

Subscription Terms (https://roskill.com/subscription-terms/)    Copyright Notice (https://roskill.com/copyright-notice/)

Website by designbooth (https://designbooth.com)

**100+ journalists covering local news, COVID-19, more → Get unlimited digital access for $2.32/week**

https://www.theadvocate.com/baton_rouge/news/business/article_d1671f0c-751c-11ea-b083-832e588bb544.html

# Alumina manufacturer in Ascension Parish laying off 300 workers in May

**BY KRISTEN MOSBRUCKER | STAFF WRITER**
APR 3, 2020 - 11:15 AM



Photo provided by IMPALA TERMINALS BURNSIDE -- After three years and $300 million in new equipment and refurbishment, Impala Terminals loaded the first shipment of petroleum coke at its Burnside facility over the July 4 weekend. Impala Terminals, a subsidiary of Netherlands-based Trafigura Group, acquired the site from Ormet.

Breaking News. Exclusive Analysis. Unlimited Digital Access →
**SUBSCRIBE HERE TODAY**

Kristen
Mosbrucker

Specialty alumina manufacturer LAlumina LLC expects is laying off 302 workers at its plant in Ascension Parish over a two-week period at the end of May for an indefinite period of time.

12/15/2020                    Alumina manufacturer in Ascension Parish laying off 300 workers in May | Business | theadvocate.com

100+ journalists covering local news, COVID-19, more → Get unlimited digital access for $2.32/week

The company, formerly known as Almatis Burnside, filed a notice
of the layoff with the Louisiana Workforce Commission in
March.

The plant has enough bauxite, the raw material used to make
alumina products such as aluminum, to last 55 to 65 days. Then,
a full shutdown will occur with layoffs taking place between
May 24 and June 7, according to a letter from management. Only
a skeleton crew is expected to remain on-site. It attributed the
layoff to a slump in alumina prices caused by the coronavirus
pandemic that has shut down businesses across the world.

LAlumina's largest customer is also its former owner, Almatis,
which sold the plant in mid-2019.

The company previously sought to cancel several economic
development incentive agreements with the state in December,
citing that it could not meet requirements of the agreements.

However, the company still has a Quality Jobs program incentive
with the state that could be affected by the layoffs.

The company did not respond to repeated requests for
comments.

Editor's note: This story was corrected at 6:30 p.m. April 3,
2020, to say the layoff is for an indefinite period of time.



**RELATED**
**Louisiana lost 4,500 jobs in past year before
recent unemployment spike amid
coronavirus outbreak**

**100+ journalists covering local news, COVID-19, more → Get unlimited digital access for $2.32/week**

RELATED

**More than 72,000 people filed for unemployment in Louisiana last week**

EMAIL KRISTEN MOSBRUCKER AT KMOSBRUCKER@THEADVOCATE.COM.